962 A.2d 1007

**Melvin CONRAD et ux.**

v.

**Otis GAMBLE, Individually et al.**

**No. 1908 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 30, 2008.

540

542

Lisa Smith Sanders of Upper Marlboro, for appellant.

Edward C. Bacon (Bacon Thornton & Palmer, LLP on the brief), of Greenbelt, Shraga Kawior (Kawior & Feldman PC.), on the brief of Silver Spring, for appellee.

Argued before DAVIS, MATRICCIANI, LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

DAVIS, J.

On February 16, 2007, Otis Gamble, appellee, filed an Amended Complaint, individually and as Personal Representative of the Estate of Stella Thomas, the decedent, alleging fraud and undue influence on the part of Melvin and Delores Conrad, appellants, and requesting, *inter alia,* that the Circuit Court for Prince George's County (1) invalidate a deed and will, transferring the decedent's property to appellants; (2) order appellants to render a full accounting as to all personal property misappropriated from the Estate; and (3) assess compensatory and punitive damages against appellants.

A trial on the matter was held in the Circuit Court for Prince George's County (Serrette, J.) on July 17 and 18, 2007. On August 8, 2007, a judgment was entered against appellants (1) declaring the deed and will to be invalid; (2) ordering a transfer of real property to the decedent's estate; (3) imposing a constructive trust on real property identified in the decedent's deed and will; and (4) rendering a judgment against appellants in the amount of $200,000, not precluding further judgment, following an accounting, "for other such monies or property misappropriated" from the Estate.

Appellants filed a "Motion to Amend Judgment, or in the Alternative, for a New Trial," which was denied on September 12, 2007. Appellants appealed the judgment of the trial court,

raising four issues for our review, which we have rephrased and reorganized as follows: [1]

I. Did the trial court err by ruling that appellants failed to rebut the presumption that the decedent's *inter vivos* gift of real property resulted from appellants' undue influence?

II. Did the trial court err by invalidating the decedent's will on the grounds that appellants exerted undue influence over the decedent?

III. Did the trial court err by excluding certain witness testimony on the grounds that it did not fall within the "state of mind" exception to the rule against hearsay?

IV. Did the trial court err by assessing a monetary award to appellee that did not credit appellants for expenses paid on behalf of the decedent?

For reasons we shall explain *infra*, we answer the first three questions in the negative and hold that the fourth question has been waived by appellants. Accordingly, we shall affirm the judgment of the Circuit Court for Prince George's County.

## FACTUAL BACKGROUND

This case involves a challenge by appellee to a deed and will executed in 2005 by the decedent, Stella Thomas.

---

1. The issues, as presented by appellants, are as follows:
 I. Whether the trial court erred in finding that [appellants] exerted undue influence as a matter of law based on a confidential relationship without finding that [appellants] undertook to exercise actual undue influence.
 II. Whether [the] trial court erred in ruling that the existence of a confidential relationship shifted the burden to [appellants] when undisputed testimony showed that decedent knew what she was doing at the time the Deed and Will were executed.
 III. Whether [the] trial court erred in excluding testimony as to the state of mind of the testator.
 IV. Whether the trial court erred in assessing a monetary award subject to escalation without hearing evidence as to credit due [appellants] for expenses paid on behalf of the decedent.

On July 10, 1995, the decedent executed a will bequeathing to appellee the decedent's home located at 2023 Spaulding Avenue in Suitland, Maryland, along with the adjoining unimproved lot and all tangible personal property within the home. The decedent's 1995 will further bequeathed the remainder of the decedent's estate to her "goddaughter," Donna Bowser, to her brothers-in-law, Nicholas Thomas and Francis Thomas and to her sisters-in-law, Mary Belle Thomas and Margaret Crawford. The Will also indicated that appellee was to serve as the personal representative of the decedent's estate. The parties stipulated at trial that the Will was prepared by Arnold Popkin, attorney at law, and filed with the Register of Wills on July 11, 1995. The parties further stipulated to the testimony of Popkin that the terms "godson" and "goddaughter" would not have been words used by Popkin but, rather, reflected the decedent's choice of words.

Approximately ten years later, on April 27, 2005, the decedent signed two documents granting a general power of attorney to Melvin Conrad, along with a specific power of attorney as to the decedent's bank account. On May 13, 2005, the decedent executed a deed conveying her real property, "in consideration of LOVE AND AFFECTION," to appellants as tenants by the entirety. On August 1, 2005, the decedent executed a last will and testament (1) appointing Delores Conrad as the executrix of the Will, (2) bequeathing the decedent's real property located at 2023 Spaulding Avenue and the adjoining lots to "my loyal cousin," Melvin Conrad and (3) bequeathing the remainder of her estate to Melvin Conrad. Appellee was not mentioned in any of these documents. The decedent died on December 8, 2005, at the age of eighty-eight.

On January 11, 2006, appellee was appointed Personal Representative of the decedent's estate by the Orphan's Court for Prince George's County. Appellee ultimately filed a complaint against appellants in the Circuit Court for Prince George's County, alleging fraud and undue influence over the decedent as to her 2005 deed and will.

### Circumstances Surrounding the 2005 Deed and Will

At trial, appellee testified that he had been a close friend of the decedent and her husband, Joseph Thomas, since the 1960s. According to appellee, the decedent, who had no children, treated him like a son and appellee referred to her as "mom." Prior to Joseph Thomas' death in 1995, appellee told Thomas that he would look after the decedent. Appellee testified that he visited the decedent three to five times per week to perform housework and provide the decedent with other assistance. Appellee also had a joint safe deposit box with the decedent. The decedent identified appellee as her emergency contact on her identification card and provided appellee with keys to her home and her car. Appellee testified that, during the entire time that he knew the decedent, he had never heard of Melvin Conrad. Donna Marie Bauser Sanders [2] testified that she was the decedent's god-daughter and had never heard of Melvin Conrad until the decedent's funeral.

On March 6, 2005, the decedent was admitted to Prince George's Hospital Center and treated for congestive heart failure. Medical records from this March 2005 hospital visit, which described the decedent as confused, forgetful, agitated and uncooperative, were admitted into evidence at trial. A psychiatric consultation conducted on March 10, 2005, indicated that the decedent was "alert and oriented to place and person; not to time" and that her "concentration" and "abstraction" was fair. A medical entry on March 11, 2005, noted that the decedent stated she has no relatives whom she trusts. At one point, decedent apparently stated that she believed that the year was 1925. A March 14, 2005 entry stated that the decedent followed commands "when it suits her."

A March 15, 2005 discharge summary signed by Dr. Chalak Berzingi, the treating physician, indicated that the decedent "seems to be having dementia with moderate cognitive impair-

---

2. Although Sanders was referred to as "Donna Bowser" in the 1995 last will and testament, the trial transcript refers to her as "Donna Marie Bauser Sanders"

ment," such that "next-of-kin or guardianship has to be established for the patient." At his deposition, Dr. Berzingi testified that he recommended the decedent's discharge to a nursing facility for her own safety and that she was indeed diagnosed with cognitive functioning impairment. Dr. Berzingi further testified that, while the decedent's mental alertness may have fluctuated from one day to the next, she largely lacked good judgment and was disoriented. During the decedent's March 2005 hospitalization, Dr. Berzingi felt it was not appropriate to obtain her consent for certain medical procedures due to her state of disorientation and confusion.

Appellee testified that, after her discharge from the hospital, the decedent was placed in the Millennium nursing home,[3] which appellee selected because it was close to the decedent's home. Appellee further testified that, after signing the decedent into the nursing home, he called the decedent's friend, Edith Murray, and asked her to meet him at the decedent's house to help him collect some of her clothes. Murray did not respond to the call. Appellee went to the decedent's home and found Murray and appellants in the decedent's room, "going through her drawers." According to appellee, this was the first time he ever met appellants. Later, at the nursing home, Melvin Conrad told appellee that he appreciated his past assistance to the decedent, but that he was "taking over."

Appellee challenged appellants' decision to "take over" and brought a copy of the decedent's 1995 will to the nursing home to demonstrate his relationship with the decedent. However, according to appellee, the nursing home allowed Melvin Conrad to "be in charge." Approximately one week later, appellee attempted to visit the decedent at the nursing home. He learned that she had been transferred to another location.

In fact, appellants had moved the decedent to Washington House, a private residential care home for senior citizens. After two visits with the decedent at Washington House,

---

**3.** The trial court's opinion and trial testimony refer to this nursing home as the "Millennium" nursing home. Appellants' brief refers to it as the "Forestville Rehabilitation Center."

appellee was informed by Mary El Amin, the owner of Washington House, that the only way he could continue to see the decedent was "to come through Melvin."

Melvin Conrad testified that he was the decedent's second cousin. According to Melvin Conrad, he moved the decedent out of the Millennium nursing home because the conditions there were "deplorable." In September 2005, appellants moved the decedent out of Washington House and into their home. Melvin Conrad denied ever telling appellee that he was "taking over" the care of the decedent, but admitted that he immediately began to make decisions regarding the decedent's care.

Melvin Conrad conceded that appellants neither sought legal advice nor advised the decedent to obtain legal advice prior to the drafting or signing of the power of attorney, the deed or the Will. In addition, the decedent did not accompany Melvin Conrad when he took the power of attorney to be notarized. According to Melvin Conrad, the decedent kept "badgering" him about drafting a will and deed for her. Delores Conrad, Melvin's wife, drafted the Will at his direction, using his father's will as a template. The decedent executed the deed in May 2005 and the Will in August 2005. However, appellants did not record the deed until September 2005.

Melvin Conrad's testimony established that he was responsible for checks or withdrawals from the decedent's bank accounts once he received powers of attorney from the decedent. He conceded that over $200,000 of the decedent's funds were transferred out of her bank account and into a bank account belonging to his daughter, Bonita Thompson. He further testified that several personal and cashier's checks were issued transferring funds to his wife and daughter. Many of these checks were for several thousand dollars. It was clear from appellant's testimony that he failed to volunteer relevant information regarding transferring the decedent's funds to his daughter during the discovery phase of the instant proceedings. Moreover, at trial, it frequently appeared difficult to

elicit concrete testimony from appellant regarding the status of the decedent's funds once placed in his daughter's bank account.

Edith Murray testified that she was a friend of the decedent and had known her since June 1959. She also "knew of" appellee. According to Murray, she and the decedent would talk almost every day. Murray testified that she became acquainted with appellants in March 2005. Murray did not approve of the conditions at the Millennium nursing home and appeared to fault appellee for placing the decedent in that environment. Murray contacted Melvin Conrad to intervene in the situation. Shortly thereafter, appellants moved the decedent to Washington House, which Murray believed to be a nicer location. Melvin Conrad testified that he had never met Murray prior to when she contacted him in March 2005.

Mary El Amin, the owner of Washington House, testified that the decedent did not appear to enjoy her visits with appellee. According to El Amin, after these visits, the decedent would stay up all night crying and repeating that she did not have a son. For this reason, El Amin instructed appellee that he could not visit the decedent without Melvin Conrad accompanying him.

Melvin Conrad testified that the decedent's health deteriorated approximately one week after the Thanksgiving holiday in 2005. The decedent had been living with appellants since September 2005. However, when asked if he believed that the decedent was generally "in poor health" from the time she left Millennium House until the moment of her death, appellant stated, "She was not in poor health as far as Melvin Conrad is concerned."

Medical records from St. Mary's Hospital, admitted into evidence at trial, painted a different picture. Those records indicate that the decedent was admitted to the hospital on November 19, 2005. According to these records, the decedent's health had been "declining in the previous months" and she was, at the time of her admission to the hospital, weak and emaciated, having not eaten for three days. It was also noted

that the decedent had a past history of Alzheimer's dementia and was anxious, crying, confused and unresponsive to questions. A speech/language evaluation indicated that the decedent had advanced dementia. Although she was discharged from the hospital, the decedent was later readmitted on December 3, 2005. The medical records produced from this December 2005 hospitalization indicated, again, that the decedent was disoriented, verbally uncommunicative and confused. They also noted that, "[a]ccording to [the decedent's] friend, the patient began developing symptoms of dementia about two years ago." A medical document issued on December 7, 2005, stated the following:

> The cousin, who had no previous contact with the patient was dissatisfied with the patient's nursing home care and arranged for her to be transferred to another nursing home. When the patient did poorly at this nursing home, he arranged for the patient to come to his home "so that she could die among family". However, he and his wife feel overwhelmed in trying to care for the patient who is now unable to eat or drink.

The decedent passed away on December 8, 2005.

Appellants alleged that they spent over $29,000 in providing for the health, welfare and maintenance of the decedent. An itemized statement of their alleged expenses was admitted at trial.

Additional facts will be discussed *infra* as warranted.

## STANDARD OF REVIEW

Maryland Rule 8–131(c) establishes that an appellate court shall review an action tried without a jury on both the law and the evidence. We will not set aside the trial court's judgment on the evidence unless it is clearly erroneous and we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* "If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous." *Fig-*

*gins v. Cochrane,* 403 Md. 392, 409, 942 A.2d 736 (2008) (internal citations omitted).

■■■ With regard to mixed questions of law and fact, "we will affirm the trial court's judgment when we cannot say that its evidentiary findings were clearly erroneous, and we find no error in that court's application of the law." *Storetrax. com, Inc. v. Gurland,* 168 Md.App. 50, 81, 895 A.2d 355 (2006), *aff'd,* 397 Md. 37, 915 A.2d 991 (2007) (internal citations omitted). As for pure questions of law, "the trial court 'enjoys no deferential appellate review,' and the appellate court 'must apply the law as it discerns it to be.'" *Id.* (internal citations omitted).

## ANALYSIS

### I

In its opinion and order, the trial court declared that the decedent's May 13, 2005 deed was invalid. Specifically, the trial court found that a confidential relationship existed between appellants and the decedent, giving rise to a rebuttable presumption that the decedent's *inter vivos* gift of real property conveyed by the May 2005 deed was a result of undue influence on the part of appellants. The trial court further found that appellants failed to rebut this presumption of undue influence, rendering the gift invalid. We shall address each of appellants' challenges to these rulings in turn.

### A. Existence of a Confidential Relationship

■■ In Maryland, the existence of a confidential relationship gives rise to a presumption that an *inter vivos* gift to the dominant party in the relationship is the product of undue influence. *Figgins,* 403 Md. at 411, 942 A.2d 736. When such a presumption arises, the "heavy" burden of demonstrating the fairness and reasonableness of the transaction shifts to the benefitting party, who must then rebut the presumption of undue influence by establishing that "the transfer was 'the free and uninfluenced act of the grantor, upon full knowledge

of the circumstances connected with it and of its contents.' "
*Id.* (internal citations omitted).

■ Appellants challenge the trial court's ruling that a confidential relationship existed between appellants and the decedent. Citing to *Henkel v. Alexander*, 198 Md. 311, 83 A.2d 866 (1951), appellants argue that there is no presumption of undue influence where the donor of an *inter vivos* gift is a competent person making a voluntary gift to a favorite relative. According to appellants, appellee failed to present "strong and conclusive proof" that the decedent was incompetent and the trial court erred by invalidating the deed.

■ Appellee argues that substantial evidence supported the court's finding that a confidential relationship existed, such that the burden shifted to appellants to rebut the presumption of undue influence.

■ "Absent a presumption arising out of certain relationships (*e.g.*, attorney-client, trustee-beneficiary, principal-agent), the existence *vel non* of a confidential relationship is a question of fact, not of law." *Midler v. Shapiro*, 33 Md.App. 264, 268, 364 A.2d 99 (1976) (internal citations omitted). Accordingly, "[i]f any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous." *Figgins*, 403 Md. at 409, 942 A.2d 736 (internal citations omitted). In this case, competent material evidence supported the trial court's finding that the decedent and appellants shared a confidential relationship.

We have previously explained:

A confidential relationship exists whenever confidence is placed by one person in another and accepted by that other person. Such a relationship may arise where a party is, under the existing circumstances, justified in believing that the other party will not act in a manner adverse or inconsistent with the reposing party's interest or welfare. It ' . . . extends to all relations in which confidence is reposed, and

in which dominion and influence resulting from such confidence may be exercised by one person over another.'

*Midler*, 33 Md.App. at 268, 364 A.2d 99 (internal citations omitted). The Court of Appeals has recently reiterated that "to establish such a relationship there must appear at least a condition from which dependence of the grantor may be found." *Upman v. Clarke*, 359 Md. 32, 41–42, 753 A.2d 4 (2000) (quoting *Green v. Michael*, 183 Md. 76, 84, 36 A.2d 923 (1944) (internal citations omitted)).

In *Figgins*, 403 Md. at 410–11, 942 A.2d 736, the Court of Appeals explored whether a confidential relationship existed between a parent and a child. In that context, the Court reviewed various factors set forth in *Treffinger v. Sterling*, 269 Md. 356, 361, 305 A.2d 829 (1973):

> Among the factors to be examined in determining whether this [confidential] relationship has come into being are the parent's advanced age, his physical debility, his mental feebleness, and his dependence on his child. None of these factors is necessarily conclusive and each should be given that weight which is warranted by the circumstances then present. Normally it is the minor child who relies heavily upon his parent for care and protection or for guidance in business affairs so that a confidential relationship exists between them with the duties running from the adult to the minor. It is only when, as a result of debility or feebleness, a parent becomes dependent on his child for aid and counsel, that a confidential relationship is re-established....

While *Treffinger* and *Figgins* dealt specifically with the existence of a confidential relationship between a parent and a child, the factors set forth in these two cases provide an instructive analytical framework in which to determine that a confidential relationship existed under the circumstances of this case.

The trial court considered the foregoing factors in its confidential relationship analysis, finding as follows:

> Melvin Conrad handled all of [the decedent's] finances pursuant to the powers of attorney prepared by him. Delores

Conrad served as her husband's partner in the interactions with [the decedent], including drafting the will which named her husband as the primary beneficiary and designated [Delores] Conrad as the contingent beneficiary and executrix. Several large checks were written to Delores Conrad from [the decedent's] account, and Delores Conrad signed the "consent to blood products" when [the decedent] was in the hospital. [Appellants] stepped into [the decedent's] life because of [the decedent's] physical debility and mental feebleness, having had no relationship with her prior to the March 2003[sic] hospitalization. [The decedent's] condition rendered her thoroughly dependent on [appellants] for *all* her needs.

These findings were supported by competent material evidence in the record. There was more than sufficient evidence to establish that, as of March 2005, the decedent was struggling with dementia and had impaired cognitive functioning, enough so that her treating physician recommended establishing guardianship over her. It was also sufficiently established that the decedent was completely reliant on appellants to provide for her well-being, as Melvin Conrad possessed the decedent's power of attorney which gave him, *inter alia,* complete control over the decedent's bank accounts. Appellants also made decisions as to where the decedent would reside and prepared the decedent's deed and will. Appellants were undoubtedly in a position to exert dominion and influence over the decedent. Accordingly, we perceive no error in the trial court's determination that a confidential relationship existed between the parties.

Appellants cite to *Henkel, supra,* to support their argument that a voluntary gift made by a competent person to a favorite relative does not give rise to a presumption of undue influence. In *Henkel,* the Court of Appeals stated:

[I]t has also been held that "when a competent person, in pursuance of a long cherished purpose, makes a voluntary gift to a favorite relative, whom he has raised from childhood and with whom he has lived on intimate and affectionate terms, there is no presumption that the donee exerted

undue influence, and the court should not set such a deed aside except upon strong and conclusive proof." On the other hand, where the grantee is in a dominant position, the burden shifts, and the grantee must show that the transaction is fair and reasonable in all respects.

198 Md. at 317–18, 83 A.2d 866 (internal citations omitted).

As discussed *supra*, the trial court's finding regarding the existence of a confidential relationship was supported by competent material evidence. Consequently, there was no need for appellee to present "strong and conclusive proof" that the decedent was incompetent in order to set aside the deed. Rather, the "heavy" burden shifted to appellants to rebut the presumption of undue influence by establishing that "the transfer was 'the free and uninfluenced act of grantor, upon full knowledge of the circumstances connected with it and of its contents.'" *Figgins*, 403 Md. at 411, 942 A.2d 736 (internal citation omitted).

### B. Rebutting the Presumption of Undue Influence

■ According to appellants, "[e]ven assuming *arguendo* that the confidential relationship . . . overrides the need to make a determination of [the decedent's] competency, there must be evidence to show that [appellants] actually exerted undue influence over [the decedent]." Appellants then posit the following:

At the trial, [Melvin] Conrad testified that [the decedent] directed him to prepare the deed. We have Ms. Mary El Amin's testimony that [the decedent] "wanted her way or the highway." The records from the Prince George's Hospital center, dated about six weeks before the deed at issue, indicated that [the decedent] was "alert, not very co-operative, follows commands when it suits her." These records are consistent with Ms. El Amin's testimony that [the decedent] knew what she wanted and would not do anything she did not want to do.

The trial court was in the unique position of weighing the evidence and judging the credibility of the witnesses. Our task on appeal is to determine whether the trial court's factual

findings are supported by competent material evidence. We are not persuaded that the trial court erred in its factual or legal analysis on this issue. We explain.

Appellants, as the donees of the decedent's *inter vivos* gift, had the "heavy" burden of establishing by clear and convincing evidence that there was no abuse of confidence. *Upman,* 359 Md. at 43, 753 A.2d 4. The trial court believed that "[appellants] clearly failed to meet that burden." Although the trial court did not specifically set forth the reasons for this conclusion in the portion of its opinion addressing undue influence as to the May 2005 deed, the trial court did set forth, at length, the reasons for its finding of undue influence as to the execution of the 2005 will.[4] We may infer that these factual findings also formed the basis for the trial court's determination that appellants failed to rebut the presumption of undue influence as to the May 2005 deed.

As noted by the trial court, appellants had no relationship with the decedent prior to her hospitalization in March 2005. The decedent's hospital records established that the decedent exhibited signs of dementia and impaired cognitive judgment. She was frequently described in the March 2005 medical records as confused, anxious and disoriented. Her March 2005 treating physician, Dr. Berzingi, testified that he did not believe that the decedent could be responsible for her own safety.

In April 2005, approximately one month after appellants first became involved in the decedent's daily routine, and immediately after this March 2005 hospitalization, appellants secured powers of attorney over the decedent, which conferred upon Melvin Conrad complete control over the decedent's funds. In addition, less than two months after appellants' first involvement in the decedent's affairs, appellants

---

4. As we shall explain *infra,* the existence of a confidential relationship does not give rise to a presumption of invalidity in the case of testamentary (as opposed to *inter vivos* ) gifts. *Upman,* 359 Md. at 35, 753 A.2d 4. Appellee, by challenging the decedent's 2005 will, retained the burden of proving undue influence on the part of appellants.

secured a deed from the decedent transferring her real property to them. No money was exchanged and the stated consideration for this transfer of property was "love and affection." A few months later, appellants prepared a will, transferring the decedent's entire estate to Melvin Conrad, and, in the event that he predeceased the decedent, to his wife, Delores. Notably, appellants did not consult counsel, nor did they advise the decedent to obtain legal advice, prior to her executing the power of attorney documents, the deed and the will. In addition, Melvin Conrad conceded that over $200,000 of the decedent's funds had been transferred by appellant Melvin Conrad out of the decedent's bank accounts and into the bank account of his daughter, Bonita Thompson. Trial testimony indicated that most of this amount, if not all of it, was transferred prior to the decedent's death in December 2005.

The decedent's medical records established that the decedent had impaired judgment and cognitive functioning during this period of time when appellants secured control over virtually every aspect of her life. In addition to the March 2005 medical records, the November and December 2005 records indicated that the decedent had a history of dementia and was confused, anxious, crying, uncommunicative, disoriented and apathetic. As the trial court noted, these records challenged the credibility of Melvin Conrad's testimony that the decedent was in good health during the time that she lived at appellants' home. They also highlight the degree of control and influence appellants could and did exert over the decedent's decisions as to her personal affairs.

Appellants ask us to take note of the testimony of Mary El Amin, the owner of Washington House, who testified that the decedent was "feisty" and insisted on having things her way. As an example of the decedent's "feistiness," El Amin noted that the decedent would insist on eating her toast with jelly. We see no error in the trial court's conclusion that El Amin's testimony and the testimony of Melvin Conrad were outweighed by appellee's testimony, the testimony of Dr. Berzingi

and the medical records evidence pertaining to the decedent's state of mind.

Our review of the record convinces us that the trial court did not err by concluding that appellants failed to meet the heavy burden of establishing, by clear and convincing evidence, that "the transfer [of property] was 'the free and uninfluenced act of grantor, upon full knowledge of the circumstances connected with it and of its contents.'" *Figgins*, 403 Md. at 411, 942 A.2d 736 (internal citation omitted).

## II

Appellants also contend that the trial court erred in setting aside the decedent's August 2005 will, arguing that the trial court "ignored evidence regarding [the decedent's] lack of susceptibility to undue influence." Specifically, appellants state that, while the decedent's medical records noted "intermittent confusion" on the part of the decedent, they also indicate that "she was alert, oriented as to person and place, and quite frequently uncooperative." Appellants emphasize that there was no evidence that the decedent was actually incompetent.

Appellee counters that there was substantial evidence in the record supporting the trial court's determination that the August 2005 will resulted from appellants' undue influence, arguing that the trial court carefully analyzed the factors set forth in *Moore v. Smith*, 321 Md. 347, 582 A.2d 1237 (1990), in reaching its determination. We agree.

■ In the case of testamentary—as opposed to *inter vivos*—gifts, "the existence of a confidential relationship between the donor and donee is simply one suspicious circumstance to be considered; it does not, of itself, give rise to a presumption of invalidity, and the burden remains with the person challenging the gift to prove a substantially overbearing undue influence." *Upman*, 359 Md. at 35, 753 A.2d 4. The Court of Appeals further explained:

[U]ndue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and

must be exerted to such a degree as to amount to force or coercion, so that free agency of the testator is destroyed. The proof must be satisfactory that the will was obtained by this coercion ... or by importunities which could not be resisted, so that the motive for the execution was tantamount to force or fear. Mere suspicion that a will has been procured by undue influence, or that a person had the "power unduly to overbear the will of the testator" is not enough. It must appear that the power was actually exercised, and that its exercise produced the will.

*Id.* at 43, 753 A.2d 4 (internal citations omitted).

In *Moore,* 321 Md. at 353–54, 582 A.2d 1237, the Court of Appeals set forth a number of factors relevant to a finding of undue influence:

Although we have not laid down a test to determine the existence of undue influence with mathematical accuracy, we have recognized in many appellate cases several elements characteristic of its presence, including:

1. The benefactor and beneficiary are involved in a relationship of confidence and trust;

2. The will contains substantial benefit to the beneficiary;

3. The beneficiary caused or assisted in effecting execution of will;

4. There was an opportunity to exert influence;

5. The will contains an unnatural disposition;

6. The bequests constitute a change from a former will; and

7. The testator was highly susceptible to the undue influence.

(Internal citations omitted). The Court added:

We have also pointed out that proving the existence of undue influence may be more difficult when it is perpetrated upon an individual with cunning and craftiness. Consequently, notwithstanding the fact that direct testimony es-

tablishing the existence of undue influence is not presented, it still may be proved by circumstantial evidence.

*Id.* at 354, 582 A.2d 1237.

The trial court made the following findings, which we quote:

1. *The benefactor and beneficiary are involved in a relationship of confidence and trust;*

As previously noted, [appellants] and [the decedent] were involved in a relationship of confidence and trust. Although [appellants] had no relationship with [the decedent] prior to the March 2005 hospitalization, they immediately took charge. [Appellants] determined where [the decedent] would live, secured powers of attorney, and exercised comprehensive control of [the decedent's] life and affairs.

2. *The will contains substantial benefit to the beneficiary;*

The 2005 Will left everything to "my loyal cousin, MELVIN CONRAD". Had [Melvin Conrad] predeceased [the decedent], everything would be given, devised and bequeathed to Delores Conrad, who was also named as executrix.

3. *The beneficiary caused or assisted in effecting execution of will;*

Delores Conrad prepared the 2005 Will. No attorney was consulted. Melvin Conrad took the 2005 Will to the Washington House where he gave it to [the decedent] to execute.

4. *There was an opportunity to exert influence;*

[The decedent's] 1995 Will was drafted by counsel and filed with the Register of Wills. No attorney was retained, nor even consulted, in drafting the 2005 Will. Nor was any effort made to provide [the decedent] an opportunity to speak with an attorney or to secure independent legal, financial or other advice prior to execution. Rather, [appellants], having "taken over" [the decedent's] affairs, immediately took control of her assets and ensured that everything was transferred to them. They rapidly secured a general power of attorney and took control of [the decedent's] bank accounts. They then transferred all of her real property to themselves. They emptied her bank accounts, transferring

more than $200,000.00 from [the decedent's] accounts to their daughter. And having acquired [the decedent's] most conspicuous assets, they hurriedly prepared a will designating themselves as sole beneficiaries.

5. *The will contains an unnatural disposition and the bequests constitute a change from a former will;*

The 1995 Will devised [the decedent's] home and the adjacent property to "my godson, Otis Gamble". The remaining estate was bequeathed, in equal shares, to [the decedent's] "goddaughter", Donna Bowser (Sanders), her brother-in-laws [sic], and sisters-in-law. The evidence established that Ms. Bowser–Sanders had a very close relationship with [the decedent], and that [the decedent's] sister-in-law, Mary Thomas, had been of assistance during the Prince George's Hospital stay. None of these individuals were mentioned in the 2005 Will. Rather, [appellants], who had been in [the decedent's] life for less than five months, were named exclusively.

Furthermore, the 2005 Will devised property to [appellants] that had purportedly been transferred to them by deed months earlier, impugning the contention that [the decedent] was aware of and understood the transactions.

6. *The testator was highly susceptible to the undue influence.*

The medical records, (Plaintiffs exhibits 4 and 11), were replete with references to [the decedent's] history of dementia and Alzheimer's disease. [The decedent's] confusion, disorientation, and inability to make safe decisions were repeatedly documented. Although a March 10, 2005 psychiatric evaluation found [the decedent's] abstraction, concentration, insight and judgment to be fair, she was diagnosed as having dementia. Subsequent records document confusion and disorientation. [The decedent's] treating physician, Dr. Chalak Berzingi, released her to a nursing home for guardianship to be established. Both the hospital records and Dr. Berzingi's testimony in this matter indicated that [the decedent] was deemed unable to consent to medi-

cal treatment due to disorientation and cognitive impairment.

While the St. Mary's Hospital records postdate the execution of the 2005 Will, the hospitalization occurred only 3½ months thereafter and reflect on both the credibility of Melvin Conrad and the condition of [the decedent]. The records established that [the decedent] was in terrible shape, mentally and physically, upon admission and that she had been ailing for months. The records document a history of dementia and Alzheimer's disease and indicate that Melvin Conrad informed the psychiatrist that [the decedent] had dementia when he initially intervened in her life.

Considering all of the evidence, the Court finds that undue influence was actually exercised, and that its exercise produced the 2005 Will.

■ The evidence was sufficient to support the trial court's finding that appellants exerted undue influence with respect to the decedent's 2005 will. As explained *supra*, appellants and the decedent were clearly involved in a relationship of confidence and trust. Appellants also clearly had an opportunity to exert control over and influence the decedent with respect to her execution of her will. They were entirely responsible for her well-being from the time she was moved to Washington House. Melvin Conrad transferred substantial amounts of the decedent's money to his wife and his daughter, without offering any compelling justification for those transfers. Appellants benefitted substantially from the 2005 will, as they were its sole beneficiaries. Furthermore, the 1995 will devised the decedent's home and adjacent property to appellee, her "godson," and the remaining estate to her "goddaughter," her brothers-in-law and her sisters-in-law. Assuming, *arguendo*, that the decedent had "fallen out" with appellee, it is suspicious, to say the least, that her 2005 will did not mention any of the other beneficiaries named in her 1995 will. Under these circumstances, it is significant that appellants made no effort to provide the decedent with counsel before she made life-altering legal decisions such as those embodied in the challenged deed and will.

In addition, the decedent's March, November and December 2005 medical records provided compelling evidence that the decedent was in fact highly susceptible to appellants' influence. As explained *supra*, multiple references were made to the decedent's dementia, confusion, disorientation and inability to make safe decisions. Appellants argue, unpersuasively, that despite references to "intermittent confusion" in the medical records, the decedent was never declared incompetent and was also found to be "alert, oriented as to person and place, and quite frequently uncooperative." The trial court, however, was best placed to weigh the credibility of the witnesses and resolve conflicts in the evidence and we will not disturb that determination absent a finding of clear error. Given the weight of the evidence in the record, we find no error in the trial court's assessment that the decedent was susceptible to undue influence and that appellants actually exercised undue influence with regard to the decedent's will.

## III

Appellants argue that the trial court erred by excluding the testimony of Edith Murray "as to why [the decedent] may have wanted to change her will." At trial, Murray was asked to testify about an interaction with appellee in 2003, at a time when the decedent was hospitalized. According to Murray, appellee showed her three documents that he wanted the decedent to sign. Approximately four days later, Murray spoke with the decedent about these documents. Appellants' counsel proceeded to examine Murray about that conversation:

[APPELLANTS' COUNSEL]: Did you ever discuss the documents with [the decedent]?

[MURRAY]: Yes.

[APPELLANTS' COUNSEL]: When did you discuss them with her?

[MURRAY]: About four days later.

[APPELLANTS' COUNSEL]: What did you say to [the decedent]?

[MURRAY]: She called me and said that he had brought papers over.

[APPELLEE'S COUNSEL]: Objection.

[APPELLANTS' COUNSEL]: Again, Your Honor, this goes to the state of mind.

THE COURT: Counsel, you're going, no, you're going far afield. You're going to have all of these conversations that she had with [the decedent]. They have to be, fall within the state of mind exception as to something that was done or not done. Nothing was done in this regard, and so I'm going to sustain the objection as to whatever [the decedent] said in this particular conversation, when indeed, nothing happened as a result of the conversation. This was 2003. It's must [sic] too remote.

[APPELLANTS' COUNSEL]: Your Honor, one of the arguments that, that counsel made in opposing my motion for judgment at the close of his case is that the Court should consider the fact that there was a change from an earlier will. Now having made that an issue, I think I should be entitled to show the reason why the testator would have wanted to make a change. Now what [appellee's counsel] is saying is, well I can't inquire into the reasons that would show the justification for her making a change. It's sort of—

THE COURT: Counsel, [appellee's counsel's] not going to determine what you can or cannot present the Court.

[APPELLANTS' COUNSEL]: No (indiscernible).

THE COURT: Well, and let me say that the Court is certainly very interested in your arguments and any evidence you are going to put on in that regard. Only, it has to be admissible evidence. So in terms of what she said to [the decedent], I have no problems with that because she can be cross-examined right now. But [the decedent's] response in this context, I will exclude, because I don't believe it's admissible. As you know, at times I've allowed it based on the circumstances of what she said and when she said it, and sometimes, it's permissible under the case law

and the rules. I don't believe it is in this particular context, which does exclude this particular (indiscernible) what she said, saw or did.

[APPELLANTS' COUNSEL]: Very well, Your Honor.

BY [APPELLANTS' COUNSEL]:

[APPELLANTS' COUNSEL]: Do you know whether or not [the decedent] ever signed any of those documents?

[MURRAY]: She did not. As far as I know, she did not.

According to appellants, Murray's testimony was admissible under the "state of mind" exception to the rule against hearsay. *See* Md. Rule 5–803(b)(3). We disagree.

In *Figgins*, 403 Md. at 419–20, 942 A.2d 736, the Court of Appeals, quoting *Hall v. University of Maryland Medical System Corp.*, 398 Md. 67, 82–83, 919 A.2d 1177 (2007), reiterated the standard of appellate review regarding hearsay evidentiary issues:

> Generally, the standard of review with respect to a trial court's ruling on the admissibility of evidence is that such matters are left to the sound discretion of the trial court and unless there is a showing that the trial court abused its discretion, "its ruling [ ] will not be disturbed on appeal." The application of that standard, however, "depends on whether the trial judge's ruling under review was based on a discretionary weighing of relevance in relation to other factors or *on a pure conclusion of law.*" If "the trial judge's ruling involves a pure legal question, we generally review the trial court's ruling *de novo.*" Under the Maryland Rules, hearsay must be excluded as evidence at trial unless it falls within an exception to the hearsay rule. Thus, a trial court's decision to admit or exclude hearsay ordinarily is an issue of law and, as discussed above, we review decisions of law *de novo.*

Accordingly, we shall proceed with our analysis of the merits of this particular issue under a *de novo* standard of review.

Hearsay is a statement made by an out-of-court declarant, offered into evidence to prove the truth of the matter asserted. Md. Rule 5–801(c). As a general rule, hearsay is inadmissible, unless one of a number of exceptions applies. Md. Rule 5–802. Maryland Rule 5–803(b)(3) provides that the following is not excluded by the hearsay rule, even if the declarant is available as a witness:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *offered to prove the declarant's then existing condition or the declarant's future action,* but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

(Emphasis added).

In *Figgins,* 403 Md. at 421, 942 A.2d 736, the Court of Appeals, citing to numerous Maryland cases, reiterated that "evidence of a 'forward-looking' state of mind is admissible only to show that the declarant, not the hearer, *subsequently acted in accord with his or her stated intention.*" (Emphasis added).

 The trial court was correct in concluding that the decedent's statements in 2003 as to why she would not sign papers brought to her by appellee did not fall within the "state of mind" hearsay exception. Appellants argue that they sought to elicit this testimony in order to establish the decedent's "state of mind" as to why she "may have wanted to change her will" in 2005. We find this argument to be unpersuasive. Based on the record before us,[5] it is unclear how the decedent's motivation for not signing documents brought to her by appellee in 2003 would constitute a then existing state of mind as to her decision to remove appellee from her will two years later in 2005. *C.f. Ebert v. Ritchey,*

---

5. We note that appellants did not proffer what Murray's response would be to this particular question.

54 Md.App. 388, 398 (1983) (in an action to impose a constructive trust upon monies received by the decedent's brother from the decedent's bank accounts, "the testimony of the three witnesses as to the content of [the decedent's] conversations with them *relative to his intent to have [brother] marshal the assets of the estate, pay the outstanding final debts, and then divide the net proceeds equally among the four siblings* was admissible under the state of mind, or true intention exception to the Hearsay Rule.") (emphasis added); *Maryland Paper Products Co. v. Judson*, 215 Md. 577, 590–91, 139 A.2d 219 (1958) (holding that the statement of an employee that he was going to pick up a gear wheel on his way to work was admissible under the "state of mind" hearsay exception as to the issue of "whether the deceased was fatally injured while acting in the course of his employment in delivering a gear wheel to his employer's place of business").

 In addition, even if the trial court's ruling was erroneous, it resulted in no prejudice to appellants, because immediately afterwards, appellants were allowed, over appellee's objection, to elicit testimony from Murray regarding the decedent's intention to change her will:

[APPELLANTS' COUNSEL]: Now going back to 2005, any time from March on, did you ever have any discussions with [the decedent] about how she wanted to have her affairs handled, and how she wanted to dispose of her property?

[MURRAY]: Yes.

[APPELLANTS' COUNSEL]: Where did you have those discussions?

[MURRAY]: At the Millennium and at Washington House.

[APPELLANTS' COUNSEL]: And what did she tell you she wanted to do?

[APPELLEE'S COUNSEL]: Objection.

THE COURT: The objection is?

[APPELLEE'S COUNSEL]: (Indiscernible) again, Your Honor.

THE COURT: Any responses?

[APPELLANTS' COUNSEL]: It shows her state of mind. Obviously, the documents were signed.

THE COURT: Counsel, I just want the objections and the responses on the record.

[APPELLANTS' COUNSEL]: I'm sorry.

THE COURT: You don't have to get so upset.

[APPELLANTS' COUNSEL]: I'm sorry. I apologize.

[APPELLEE'S COUNSEL]: It's an evidentiary issue.

THE COURT: Overruled.

BY [APPELLANTS' COUNSEL]:

[APPELLANTS' COUNSEL]: You may answer the question.

[MURRAY]: What was your question?

[APPELLANTS' COUNSEL]: What did she tell you she wanted?

[MURRAY]: She told me she was leaving whatever she had to Melvin.

Moreover, Mary El Amin, the owner of Washington House, was also allowed to testify, over appellee's objection, that the decedent told her that she wanted her cousins to have "what little that she had...." In light of this testimony, it is not true, as appellants argue, that "[n]o testimony was taken regarding [the decedent's] present state of mind indicating testamentary intent...."

The trial court's decision to exclude this particular aspect of Murray's testimony was not erroneous, nor did any prejudice flow from it. Accordingly, we resolve this issue against appellants.

## IV

▉ Appellants finally argue that the trial court assessed a monetary award "without hearing evidence as to credit due [appellants] for expenses paid on behalf of the decedent." Without citing any law, appellants argue that "testimony and evidence presented at trial clearly showed that [appellants] expended over $29,000 for [the decedent's] care until her

death in December 2005." In fact, appellants' *entire* argument on this point consists of the following:

> Finally, testimony and evidence presented at trial clearly showed that [appellants] expended over $29,000.00 for [the decedent's] care until her death in December 2005. Testimony of Melvin Conrad, July 17, 2007, at pages 123–124 (E 164–165); List of Expenditures for [the decedent] and cancelled checks, Plaintiff's Exhibit 12 (E 728–762); Tabulation of Expenditures, Defendant's Exhibit 1 (E 795). The Circuit Court imposed a money judgment against [appellants] in the amount of $200,000, representing the approximate amount of funds in [the decedent's] bank accounts at the time [Melvin] Conrad was appointed her attorney-in-fact. This money judgment fails to account for the uncontroverted evidence regarding the expenditures made on behalf of the decedent.

Appellants have failed to cite *any* authority in support of their proposition that the trial court erred in its assessment of a monetary award in this case.[6] We have previously explained that it "is not our function to seek out the law in support of a party's appellate contentions." *Higginbotham v. Public Service Comm'n of Maryland,* 171 Md.App. 254, 268, 909 A.2d 1087 (2006) (quoting *Anderson v. Litzenberg,* 115 Md.App. 549, 578, 694 A.2d 150 (1997)). Because appellants' argument is "completely devoid of legal authority," we deem this contention to be waived and decline to address the issue on its merits. *Anderson,* 115 Md.App. at 577–78, 694 A.2d 150 (discussing *Oroian v. Allstate Ins. Co.,* 62 Md.App. 654, 490 A.2d 1321 (1985)); *see also Higginbotham,* 171 Md.App. at 268, 909 A.2d 1087.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID APPELLANTS.**

---

6. We also note that appellee, in refuting appellants' argument, has also cited to no authority on this issue.