63 A.3d 1192

**BALTIMORE POLICE DEPARTMENT, et al.**

v.

**Joshua Tripp ELLSWORTH.**

**No. 0005, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

March 25, 2013.

Daniel C. Beck, (George A. Nilson, City Solicitor, Neal M. Janey, Jr., Christopher C. Sakles, on the brief), Baltimore, MD, for Appellant.

Clarke F. Ahlers, Columbia, MD, for Appellee.

Panel: ZARNOCH, WRIGHT, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

WRIGHT, J.

This appeal arises from the decision of a Baltimore City Police Department trial board (the "Board") finding appellee, Joshua Tripp Ellsworth, a detective in the Homicide Unit, guilty of two violations of the Baltimore City Police Department Administrative Rules and Regulations. The appellant, the Baltimore City Police Department ("BPD"), charged Det. Ellsworth with seven violations based on incidents that occurred on August 7, 2009. At the hearing before the Board, the BPD called Ofc. Daniel Redd as a fact witness. Det. Ellsworth sought to impeach Ofc. Redd's credibility based on an ongoing investigation of Ofc. Redd's alleged drug dealing, but was not provided with, or permitted to introduce, extrinsic evidence of Ofc. Redd's activities. On August 19, 2011, Det. Ellsworth filed a Petition for Judicial Review of the Board's decision in the Circuit Court for Baltimore City contending that the BPD was required to provide the evidence of Ofc. Redd's activities under the "exculpatory evidence" provision of the Law Enforcement Officer's Bill of Rights ("LEOBR"),

Md.Code (2003, 2011 Repl.Vol.) Public Safety Article ("PS") § 3–104(n). The circuit court reversed the decision of the Board and remanded the matter for further proceedings. This timely appeal followed.

## Questions Presented

The BPD asks us to determine the following:

1. Did the Circuit Court err in finding that [BPD] violated the rights of the Appellee under LEBOR [sic] § 3–104(n)(1) by failing to disclose any information regarding the FBI's investigation of a witness in the trial board, Daniel Redd, for distributing controlled dangerous substances and hand-gun violations?

2. Did the Circuit Court err in finding that [BPD] violated the rights of the Appellee under LEBOR [sic] § 3–104(n)(1) without analyzing whether the error was harmless or that the prejudice was probable.

Because we answer the first question in the affirmative and affirm the decision of the Board, we need not address BPD's second question.

## Facts and Procedural History

On August 7, 2009, BPD's Northwestern District Patrol Unit ("Patrol"), along with several other units, including DDU[1] and Homicide, responded to the possible abduction of a young female correctional officer from a hair salon at 4600 West Northern Parkway (the "Salon scene"). Sergeant Milton Snead, a DDU supervisor, spoke with Sgt. Deneen Williams of the Family Crimes Unit ("FCU") who asked him to send units to the Salon scene, gather information, and report back before FCU sent any units to investigate. Sgt. Snead informed Ofc. Redd, Det. Thomas Bender, and Lt. Damien Carter (who was off-duty at the time) and Sgt. John Jackson notified Det. Ellsworth of the possible abduction at the Salon scene.

---

1. "DDU" is not defined in the record. Based on the testimony, we infer that it stands for "District Detective Unit."

When Ofc. Redd and Det. Bender arrived at the Salon scene, Det. Ellsworth and Sgt. Jackson were already present along with with several other units and several correctional officers. Ofc. Redd and Det. Bender spoke to Det. Ellsworth, who informed them that Homicide was not handling the investigation. Ofc. Redd gave Det. Ellsworth his cell phone so that Det. Ellsworth could update Sgt. Williams. When he finished, Det. Ellsworth told Ofc. Redd that FCU would respond to the scene. It is unclear whether FCU ever responded to the Salon scene.

As the BPD conducted a preliminary investigation at the Salon scene, a second possible crime scene was identified in the 2700 block of West Garrison Boulevard (the "Garrison scene"). The second crime scene was preliminarily identified based on a van matching the description of one involved in the alleged abduction and an address allegedly associated with the suspected kidnapper ("the suspect"). The initial BPD officers to respond to the Garrison scene consisted of Patrol units commanded by Sgt. Jonathan Brickus.

Lt. Carter testified that when he arrived at the Garrison scene, the scene was unsecured and Sgt. Brickus, as the ranking Patrol person at the scene, was in charge. According to Ofc. Sharron Mason of the Northwest District Foot Patrol, Sgt. Brickus was the "acting lieutenant that day." However, Lt. Carter was the permanent ranking supervisor present at the scene. Ofc. Mason arrived at the same time as Lt. Carter and Sgt. Brickus, followed by Ofcs. Monique Lucien and Richard Rouse. Dets. Kendall Rickburg and Augustus Lake were next. Det. Ellsworth, Ofc. Redd, and Det. Bender arrived shortly thereafter.

Lt. Carter and Sgt. Brickus began formulating an investigation strategy after they arrived but had not settled on a plan when Det. Ellsworth arrived. Additionally, there was some confusion about who would be handling the investigation. When Det. Ellsworth reached the scene, he told Sgt. Brickus that Homicide was not handling the investigation; either FCU or DDU was in charge. Lt. Carter told Det. Ellsworth that

DDU was not handling the investigation. Sgt. Brickus contacted Sgt. Williams, who informed him that FCU would handle the domestic part of the case and she would contact Homicide to determine who was handling the abduction.[2] As a result, it was not clear when Det. Ellsworth arrived that Patrol and Sgt. Brickus, as the Patrol supervisor, were relinquishing control of the investigation.

The BPD did not know which house on the block, if any, contained the suspect and victim. Det. Ellsworth initially joined Lt. Carter and Sgt. Brickus where they were positioned but, before a formal plan was established, Det. Ellsworth turned away from them and began to walk toward 2727 West Garrison Avenue ("the House"). When Sgt. Brickus realized Det. Ellsworth was walking toward the House, he told Det. Ellsworth not to go down the street. Det. Ellsworth did not respond to Sgt. Brickus. Sgt. Brickus "yelled again, 'Don't go down the street.'" When Det. Ellsworth did not stop, Sgt. Brickus yelled that if Det. Ellsworth continued, he was suspended. Det. Ellsworth yelled back to Sgt. Brickus, "do what you got to do." Lt. Carter then "yelled to Det. Ellsworth to come back and he complied, no issues." Det. Ellsworth was not suspended that night.

As Det. Ellsworth walked back, Sgt. Brickus met him in the street and the two engaged in a "heated" exchange before numerous civilians and BPD officers. Sgt. Brickus demanded that Det. Ellsworth turn over his badge and handgun, and Det. Ellsworth resisted. Sgt. Brickus reached for Det. Ellsworth's badge and Det. Ellsworth pulled away. The two exchanged words with Det. Ellsworth telling Sgt. Brickus that he did not have the authority to suspend him as he was not his supervisor. Lt. Carter intervened, informed Det. Ellsworth that he (Lt. Carter) was his supervisor, and instructed Det.

---

2. We were informed at oral argument that the assignment of Homicide to kidnaping cases was instituted because many abduction cases end in homicide investigations. If Homicide is in charge of an investigation, a Homicide Detective would be in charge although he would be subordinate in rank to other police officers at the scene of the investigation.

Ellsworth to surrender his badge and handgun to Sgt. Brickus. Det. Ellsworth complied.

Lt. Carter separated Det. Ellsworth and Sgt. Brickus telling Det. Ellsworth to go sit in his car and call the Homicide supervisor. Approximately twenty minutes after telling Det. Ellsworth to sit in his car, Lt. Carter instructed Ofc. Redd and Det. Bender to begin investigating by talking to the neighbors on the street. At that point, Det. Ellsworth was sitting on the hood of his car per Lt. Carter's instructions. Lt. Carter then received a phone call from Maj. David Engel, his own supervisor, and walked away from the Garrison scene to brief Maj. Engel on the situation and scene.

When Det. Bender went down the street to talk to neighbors, Det. Ellsworth accompanied him. After speaking to a man living next door to the House, Det. Bender and Det. Ellsworth stepped over the porch rail and onto the porch of the House. Det. Bender looked through the mailbox and either Det. Bender or Det. Ellsworth knocked on the door of the House. As they were knocking on the door, Sgt. Brickus noticed them and looked for Lt. Carter to have Lt. Carter intervene. Lt. Carter had "drifted away" from the Garrison scene, while still on his cell phone, and was unavailable. Sgt. Brickus ran to the House and ordered both Det. Bender and Det. Ellsworth to get off the porch.

Det. Bender immediately complied but Det. Ellsworth did not. Sgt. Brickus interposed himself between Det. Ellsworth and the door and again told Det. Ellsworth to get off the porch. When Det. Ellsworth refused, Sgt. Brickus pushed him off the porch. Det. Ellsworth then attempted to re-enter the porch but Sgt. Brickus rebuffed him, turned him around, and took out his handcuffs. Det. Ellsworth told Sgt. Brickus something to the effect of "arrest me."

Seeing the altercation, Sgt. Jackson told Lt. Carter that Det. Ellsworth and Sgt. Brickus were "at it again" and ran down the street. Reaching the two men, Sgt. Jackson separated Sgt. Brickus and Det. Ellsworth. Sgt. Jackson walked with Det. Ellsworth back in the direction of Lt. Carter. Sgt.

Brickus put his handcuffs away and also walked back. Meanwhile, Lt. Carter told his supervisor that he was placing himself on duty and taking charge of the Garrison scene because "it was getting ridiculous." Shortly after Sgt. Jackson separated Sgt. Brickus and Det. Ellsworth, Lt. Carter was informed by a supervisor via cell phone that Homicide was taking charge of the investigation. Based on this information and the information that the van and House were not involved with the suspect, Lt. Carter ordered the DDU and Patrol personnel to leave the scene. When only Lt. Carter, Sgt. Brickus, and Det. Ellsworth remained, Lt. Carter ordered Sgt. Brickus to return Det. Ellsworth's handgun and badge.

Sgt. Brickus initiated a complaint against Det. Ellsworth and on August 10, 2010, the BPD charged Det. Ellsworth with seven violations of the following Rules and Regulations of the Police Department of Baltimore City: 1) conduct unbecoming an officer; 2) willfully disobeys [sic] a lawful command or order; 3) unethical conduct of failing to cooperate and assist colleagues; and 4) insubordinate or disrespectful to superior officer. The Charging Committee recommended that Det. Ellsworth be terminated. Rather than accept the recommended punishment, Det. Ellsworth elected a Trial Board hearing pursuant to PS § 3–107.[3]

A three-day hearing began on May 17, 2011, before the Board. The Board consisted of Deputy Maj. Marc Partee, Lt. Jon Foster, and Ofc. Meng–Ching Liu of the BPD. Both parties were represented by counsel. Seven witnesses testified and twenty-two exhibits were entered into evidence.

During the hearing, Det. Ellsworth's counsel attempted to impeach Ofc. Redd's credibility through testimony and evi-

---

**3.** PS § 3–107 states in pertinent part:

(a) (1) Except as provided in paragraph (2) of this subsection and §§ 3–111 of this subtitle, if the investigation or interrogation of a law enforcement officer results in a recommendation of demotion, dismissal, transfer, loss of pay, reassignment, or similar action that is considered punitive, the law enforcement officer is entitled to a hearing on the issues by a hearing board before the law enforcement agency takes that action.

dence related to an alleged ongoing FBI investigation of Ofc. Redd. After objection by BPD's counsel, the Board consulted with its legal counsel regarding the admissibility of the impeachment evidence and did not allow extrinsic evidence of any alleged wrongdoing by Ofc. Redd to be admitted.

The Board found Det. Ellsworth guilty of two of the seven charges against him [4] and recommended seven days loss of leave and a letter of reprimand as punishment. The Police Commissioner imposed this punishment in Personnel Order 538–11 dated July 19, 2011. The Board also recommended that Det. Ellsworth be transferred from the Homicide Section if the Homicide Commanding Officer wished to do so, but Det. Ellsworth was not transferred.

On August 19, 2011, Det. Ellsworth filed a Petition for Judicial Review in the circuit court arguing that the Board erred in not requiring the BPD to provide "exculpatory" evidence related to Ofc. Redd's alleged misconduct to Det. Ellsworth. On January 10, 2012, the circuit court heard the case and reversed the decision of the Board in a Memorandum and Order on January 26, 2012. The circuit court found that the BPD's "failure to disclose any information regarding the investigation of Ofc. Redd constituted a violation of Det. Ellsworth's rights under the [LEOBR] and, therefore, constituted an unlawful procedure." The circuit court remanded the case to the Board for further proceedings. The circuit court's decision was entered on March 1, 2012, and the BPD filed this timely appeal.

Additional facts will be provided as necessary in the relevant sections below.

---

4. Those charges were Charge 1, Specification 3, which stated that Det. Ellsworth, by entering into the verbal confrontation with Sgt. Brickus in front of other officers and the public, "conduct[ed] himself in a manner unbecoming a member of the Baltimore Police Department;" and Charge 4, Specification 1, which stated that Det. Ellsworth "behaved in an insubordinate and/or disrespectful" manner by engaging in the verbal confrontation with Sgt. Brickus.

## Standard of Review

 The scope of judicial review of a LEOBR case is the same as for an administrative appeal. *Coleman v. Anne Arundel Cnty. Police Dep't,* 369 Md. 108, 121, 797 A.2d 770 (2002). When this Court reviews administrative decisions, "we bypass the judgment of the circuit court and look directly at the administrative decision." *Salisbury Univ. v. Joseph M. Zimmer, Inc.,* 199 Md.App. 163, 166, 20 A.3d 838 (2011) (citing *White v. Workers' Comp. Comm'n,* 161 Md.App. 483, 487, 870 A.2d 1241 (2005)). Our inquiry is whether the administrative agency erred not the circuit court acting in its capacity as an intermediate appellate court. *Bayly Crossing, LLC v. Consumer Prot. Div., Office of Atty. Gen.,* 417 Md. 128, 136, 9 A.3d 4 (2010). "In reviewing an administrative agency decision, we are limited to determining if there is substantial evidence in the record as a whole to support the agency's finding and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Mehrling v. Nationwide Ins. Co.,* 371 Md. 40, 57, 806 A.2d 662 (2002) (internal citation omitted). The Court of Appeals explained:

> In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.

*Motor Vehicle Admin. v. Carpenter,* 424 Md. 401, 412–13, 36 A.3d 439 (2012) (quoting *Md. Aviation Admin. v. Noland,* 386 Md. 556, 571, 873 A.2d 1145 (2005)) (internal citations and quotation marks omitted).

 An agency's factual findings are given deferential review, but this Court is not bound by the agency's interpretation of law, which are reviewed *de novo. See Coleman,* 369

Md. at 122, 797 A.2d 770; *Salisbury Univ., supra,* 199 Md. App. at 166, 20 A.3d 838 (citing *Mayer v. Montgomery Cnty.,* 143 Md.App. 261, 794 A.2d 704 (2002)); *State Dep't of Assessments & Taxation v. N. Balt. Ctr., Inc.,* 129 Md.App. 588, 595, 743 A.2d 759 (2000). However, "the agency's interpretations and applications of statutory or regulatory provisions 'which the agency administers should ordinarily be given considerable weight by reviewing courts [and] the expertise of the agency in its own field should be respected.' " *Noland,* 386 Md. at 573 n. 3, 873 A.2d 1145 (quoting *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376 (1999)). Where an administrative decision is premised upon a pure question of law, "we must 'determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Bray v. Aberdeen Police Dep't,* 190 Md.App. 414, 424, 988 A.2d 1106 (2010) (quoting *Noland,* 386 Md. at 573 n. 3, 873 A.2d 1145).

## Discussion

 The BPD argues that the circuit court incorrectly interpreted LEOBR § 3–104(n)(1)(ii) in holding that the BPD failed to turn over "exculpatory material prior to the hearing before the Board." The BPD asserts that the language of LEOBR § 3–104(n)(1) is "straightforward and unambiguous" in its explanation of what the BPD was required to provide to Det. Ellsworth regarding its investigation of his conduct. The BPD acknowledges that the LEOBR does not provide an internal definition for the terms "exculpatory" and "non-exculpatory," but avers that the definitions are well established by precedent. The BPD contends that "[n]othing in LEBOR [sic], or the case law interpreting the statute, requires a law enforcement agency to provide impeachment evidence for the witnesses it plans to put on at the trial board against the accused officer." The BPD argues that information regarding any investigation of Ofc. Redd is inappropriate as impeachment material and is not exculpatory as to the charges against Det. Ellsworth.

Det. Ellsworth responds that the circuit court correctly found that he had a statutory right to request exculpatory evidence, the BPD provided no evidence regarding Ofc. Redd, Det. Ellsworth was prejudiced because of how the BPD dealt with Ofc. Redd, and "the failure to disclose exculpatory evidence in violation of the statute constituted an unlawful procedure." Det. Ellsworth avers that the Board allowed the BPD to impede his cross-examination of Ofc. Redd "on the subject of exculpatory evidence" by disallowing the evidence of Ofc. Redd's prior bad acts. Det. Ellsworth asserts that if the BPD knew of Ofc. Redd's alleged misconduct, it "was required to disclose this information before using Ofc. Redd as a witness against Det. Ellsworth." We agree with the BPD.

■ As a law enforcement officer, Det. Ellsworth is entitled to the protections of the LEOBR, which grants rights that are not available to the general public or other employees, including notice and the right to a hearing before any punitive action is taken. *See Bray,* 190 Md.App. at 424, 988 A.2d 1106; *Ocean City Police Dep't v. Marshall,* 158 Md.App. 115, 124, 854 A.2d 299 (2004). The disciplinary action at issue is a civil matter, rather than a criminal matter, and therefore the Maryland Rules and standards applicable to a civil trial are relevant. *See, e.g., Coleman,* 369 Md. 108, 797 A.2d 770.

LEOBR § 3–104(n)(1) states:

(n) Information provided on completion of investigation.—

(1) On completion of an investigation and at least 10 ten days before a hearing, the law enforcement officer under investigation shall be:

(i) notified of the name of each witness and of each charge and specification against the law enforcement officer; and

(ii) provided with a copy of the investigatory file and any exculpatory information, if the law enforcement officer and the law enforcement officer's representative agree to:

1. execute a confidentiality agreement with the law enforcement agency not to disclose any material contained in the investigatory file and exculpatory information for any

purpose other than to defend the law enforcement officer; and

　2.　pay a reasonable charge for the cost of reproducing the material.

Det. Ellsworth argues that "exculpatory evidence" includes information that Ofc. Redd committed multiple acts of misconduct, for which the rules of the BPD permit impeachment.[5] Maryland Rule 4–263 governs pretrial procedures in criminal cases. Pursuant to Maryland Rule 4–263, the State's Attorney is required to disclose both "exculpatory information" and "impeachment information." Exculpatory information is defined in Maryland Rule 4–263(d)(5) as "[a]ll material or information in any form, whether or not admissible, that tends to exculpate the defendant or negate or mitigate the defendant's guilt or punishment as to the offense charged." Impeachment information is defined in Maryland Rule 4–263(d)(6) as "[a]ll material or information in any form, whether or not admissible, that tends to impeach a State's witness including ... evidence of prior conduct to show the character of the witness for untruthfulness pursuant to Maryland Rule 5–608(b); ... prior criminal conviction, pending charges, or probationary status ..." The LEOBR does not contain a similar requirement, nor do the Maryland Rules relating to discovery in civil cases. *See* Maryland Rules 2–401, 2–402, and 3–401. The LEOBR only requires that the charged officer be provided with "a copy of the investigatory file and any exculpatory information." *See* PS § 3–104(n).

The definition of "exculpatory" as set forth in the criminal context is nonetheless instructive. In *Robinson v. Maryland,*

---

**5.** Det. Ellsworth does not cite any part of the BPD rule in support of his argument and we are not required to ferret one out of the record or attempt to locate one elsewhere. *See Conrad v. Gamble,* 183 Md.App. 539, 569, 962 A.2d 1007 (2008). However, we note that our examination of the record reveals a statement by counsel for the BPD that Board procedures allow impeachment "by showing that he ... has committed a specific act of misconduct." This ground for impeachment is consistent with the Maryland Rules of Evidence but does not support the argument that any evidence of a "prior bad act" is admissible. Additionally, the LEOBR is bereft of any support.

354 Md. 287, 297–98, 730 A.2d 181 (1999), the Court of Appeals affirmed a circuit court's jury instruction that exculpatory "means free from guilt ... the opposite of guilty." The Court of Appeals has adopted the definition of exculpatory as "clearing or tending to clear from alleged fault or guilt." *See Colkley v. State*, 204 Md.App. 593, 607, 42 A.3d 646, *cert. granted*, 429 Md. 81, 54 A.3d 759 (2012) (quoting *State v. Giles*, 239 Md. 458, 469, 212 A.2d 101 (1965)); *accord Jackson v. State*, 207 Md.App. 336, 52 A.3d 980 (2012). Det. Ellsworth fails to make a persuasive argument that the information pertaining to Ofc. Redd's alleged misconduct would tend to clear him of the administrative charges of being disrespectful to a superior officer or engaging in conduct unbecoming an officer—and, therefore, does not fall within the definition of "exculpatory."

Det. Ellsworth's argument is that any information that the BPD had regarding Ofc. Redd's alleged misconduct would have facilitated his impeachment of Ofc. Redd's credibility. As discussed, the LEOBR, unlike the Maryland Rules for criminal cases, does not require disclosure of impeachment evidence. Impeachment evidence is governed by Maryland Rule 5–608(b), which states:

> (b) Impeachment by examination regarding witness's own prior conduct not resulting in convictions. The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

The Court of Appeals has stated that a witness may be cross-examined about prior bad acts "which are relevant to an assessment of the witness' credibility." *Taylor v. State*, 407 Md. 137, 155, 963 A.2d 197 (2009) (citation omitted). However, "in cases regarding prior misconduct, the cross-examiner is bound by the witness' answer and, upon the witness' denial,

may not introduce extrinsic evidence to contradict the witness or prove the discrediting act." *Id.* (citation omitted). Moreover, "when impeachment is the aim, the relevant inquiry is not whether the witness has been accused of misconduct by some other person, but whether the witness actually committed the prior bad act. A hearsay accusation of guilt has little logical relevance to the witness' credibility." *Thomas v. State,* 422 Md. 67, 78–79, 29 A.3d 286 (2011) (citation omitted).

At the time of the hearing before the Board, Ofc. Redd had not been convicted of any crime. The cases cited by Det. Ellsworth in support of his argument that Ofc. Redd's misconduct should have been permitted for impeachment purposes are distinguishable as they involved either prior convictions or the witnesses were parties to the crime charged. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (suppressed evidence was from co-conspirator with motive to fabricate upon whose testimony the government's case depended "almost entirely"); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (defendant unaware of confession of co-defendant). A review of the record demonstrates that Det. Ellsworth extensively cross-examined Ofc. Redd about his alleged misconduct during the hearing.

During cross-examination of Ofc. Redd by Det. Ellsworth's counsel, the following took place:

[COUNSEL FOR DET. ELLSWORTH]:

Q: How come you're not a detective?

[COUNSEL FOR BPD]: Objection. Relevance.

[COUNSEL FOR DET. ELLSWORTH]: Impeachment.

[COUNSEL FOR BPD]: Proffer as to how that's relevant to his—

[COUNSEL FOR DET. ELLSWORTH]: I'd prefer not to make a proffer. You can rule.

[COUNSEL FOR BPD]: Well, if I can consult the manual here with respect to proffers, please. Board's indulgence.

What I've requested or what I've I guess made my note—what I'm noting to the Board is that counsel for the defendant is—well, is trying to go down what he says is a path where he's going to try to impeach this witness. And what I'm asking for is a proffer, for instance, have him explain to the court what it is that he intends to use as this impeaching evidence and to read from the manual, page 8, that has to do with Section 1–507 of proffers. It says, "In a case of a ruling excluding evidence, the substance of the evidence may be made known to the Hearing Board by offer of proof on the record or where the nature of the evidence was apparent from the context within which the evidence was offered. This permits a review in court to examine the evidence in the event that there is a finding that the Hearing Board erred in excluding the evidence."

Essentially all I'm asking for is that if, you know, where is this line of questioning going? Whether or not he is or is not a detective, why he has elected or hasn't elected or for whatever reason is not a detective, I don't know. But that clearly is not relevant to anything that is at issue in this case. It's only being offered to impeach his credibility. I'd just like to know—have counsel make a proffer as to how that would in any way impeach his credibility, the fact that he is or is not a detective.

[BOARD]: All right. Well, I'll direct your attention to that next section.

[COUNSEL FOR BPD]: Yes.

[BOARD]: Where it talks about impeachment of witnesses.

[COUNSEL FOR BPD]: Yes.

[BOARD]: It states a witness' credibility may always be attacked on cross-examination irrespective of the scope of direct examination.

[COUNSEL FOR BPD]: Yes, members of the Board. It also says how a witness may be impeached. He can be impeached by showing that he is biased or prejudiced, is incapacitated from being a witness, has a bad reputation in the neighborhood for truth or veracity, has been convicted

of a crime involving moral turpitude, has committed a specific act of misconduct, has made a prior inconsistent statement, has some ulterior motive or stake in the outcome or has been solicited to commit perjury. Those are the grounds for impeachment.

[BOARD]: For impeachment.

[COUNSEL FOR BPD]: What I'm asking for is a proffer for as to how this line of questioning fits into those proper grounds of impeachment.

[COUNSEL FOR DET. ELLSWORTH]: I decline to make a proffer. The rules are being misquoted. The rule about proffer is if you sustain an objection to a line of questioning, I can then proffer for the appellate court why I wanted to ask the questions. That is to protect my client on appeal. It's not a sword or shield for the prosecutor to use to force me to tell the witness where I'm going.

After a bit more colloquy, the Board overruled BPD's objection and allowed the cross-examination to continue. Immediately thereafter, the following occurred:

[COUNSEL FOR DET. ELLSWORTH]:

Q: Detective, do you—or officer, do you have a criminal defense attorney in your employ?

A: A criminal defense attorney?

Q: Yes. Have you hired a criminal defense attorney to represent you?

[COUNSEL FOR BPD]: I would object based on relevance.

\* \* \*

[COUNSEL FOR DET. ELLSWORTH]: Well, I'm actually asking it to protect the witness, meaning if he has a criminal defense attorney he may wish to consult with that person before I ask certain questions.

[COUNSEL FOR BPD]: Well, I would just say it's outside of the scope of the direct. I mean if he wants to bring up specific convictions that this witness may have, assert the conviction. But whether he has retained a defense attorney

for a case that may or may not have been fully adjudicated is ridiculous. It's not relevant.

[COUNSEL FOR DET. ELLSWORTH]: At some point, the Board ought to take control of the prosecutor because it is not fair that every question I ask be interrupted with a dialogue. It really isn't fair. The rules are clear. I'm allowed to impeach on prior bad acts. They need not be convictions. And I'm allowed to ask questions that go to bad reputation, specific acts of misconduct.

Now some of those specific acts of misconduct constitute felonies, federal crimes. And a person may or may not wish to testify under oath about such federal crimes here and may have counsel. And so it's perfectly appropriate for me to first establish, in fairness to the witness, whether or not he's engaged an attorney.

[COUNSEL FOR BPD]: I just think it's a matter of just too convenient for defense counsel to have—

[COUNSEL FOR DET. ELLSWORTH]: All right. Then I move for production of this witness' prior bad acts, everything the prosecutor knows about that he's done. And if he hasn't interviewed this man under oath about his prior bad acts, then shame on the prosecutor because he's interrupting my opportunity to impeach this witness.

[COUNSEL FOR BPD]: What I am asserting, members of the Board, is that if he has impeaching materials, impeach. Impeach away as is your right—

[COUNSEL FOR DET. ELLSWORTH]: How do I do that without asking a question? Because every question I ask there's an objection and an argument. Please tell me the protocol so that I can follow the rules of this Board.

[COUNSEL FOR BPD]: If defense counsel is asserting that I'm disrupting by making valid objections, I don't know what to say to that. I have a right as well to represent the interests of the Department. I have a right to make objections.

[BOARD]: Yeah. I'm going to have to overrule your objection.

* * *

[COUNSEL FOR Det. Ellsworth]:

Q: Now is it true that you know you are the subject, in fact the target, of an ongoing federal criminal investigation?

A: No.

At this point, Board member Maj. Partee stated, "I'm going to ask that we take a recess so that we may consult with our legal advisors because this is—it's getting—the scope is getting a little bit large for us, and we want some clarification before we move on." After the recess, the Board stated:

Right. All right. So we'll continue—we're going to give you the opportunity to impeach the witness as you have, you know, as you're allowed to do. But what we want to make sure is that this is—this doesn't become a trial inside of a trial. So we'll let you speak ... but be reminded that when the question was asked whether he was aware of an ongoing investigation the witness stated no. So that line of questioning should be done at that—at this point because he has no knowledge of that as he's stating. But you can continue to speak to his character in terms of prior bad acts or conviction which is stated in the rules.

* * *

[W]e will treat every objection on its own merits and ask for clarification from counsel.

Det. Ellsworth's counsel then continued to try and impeach Ofc. Redd, as follows: [COUNSEL FOR DET. ELLSWORTH]:

Q: Have you and Police Officer Shorter ever discussed a federal criminal investigation in which you or Shorter are the target?

[COUNSEL FOR BPD]: Objection. Goes to I'm—I just— I believe it's not relevant. I mean if we're talking about a prior bad act, and we're trying to impeach on the basis of a prior bad act, what is that prior bad act? If we're impeach-

ing on the basis of a conviction, what is that conviction? What is the relevance, and how does it go in any way whether or not they've had any—

[BOARD]: Okay. I'm going to have to overrule. I think we're going to the relevance. But please, let's not take the scenic route. Let's to [sic] straight there.

[COUNSEL FOR DET. ELLSWORTH]:

Q: Have you and police officer whose last name is Shorter ever discussed a federal criminal investigation involving either one of you?

A: No.

 \* \* \*

Q: Since you were 18 years of age, have you ever distributed a controlled dangerous substance?

A: No.

[COUNSEL FOR BPD]: Objection. It's about convictions. The way the question is framed is improper.

[COUNSEL FOR DET. ELLSWORTH]: That's just not accurate.

[BOARD]: It says "or convictions" so I'm going to have to overrule that objection.

Det. Ellsworth's counsel then asked Ofc. Redd if he had ever been terminated from the BPD and, over objection, Ofc. Redd testified that he had once been "wrongfully terminated" for "sleeping on duty." Det. Ellsworth's counsel continued his cross-examination as follows:

Q: In the internal investigation about your sleeping on duty, were you also charged with an integrity violation?

A: No.

Q: And so you were terminated for falling asleep on duty?

A: Yes.

Q: And for no other reason?

A: Yes.

 \* \* \*

Q: By the way, sir, why were you transferred out of detectives?

A: I have no idea.

Q: Didn't you ask?

A: Didn't get an answer.

The record demonstrates that the Board allowed, over the BPD's objections, Det. Ellsworth to question Ofc. Redd about "prior bad acts" but limited Det. Ellsworth to the answers given by Ofc. Redd. In accordance with the Maryland Rules, the Board correctly denied the introduction of extrinsic evidence related to Ofc. Redd's "prior bad acts."

As to Det. Ellsworth's statutory right to request exculpatory evidence, the BPD preemptively asserted that Det. Ellsworth was "not entitled to have access to the investigatory file involving Officer Ofc. Redd because it is confidential under both Maryland law and federal law." We need not address this argument as the record does not reflect that Det. Ellsworth made any request for the investigatory file pursuant to either the federal Freedom of Information Act, 5 U.S.C. § 552 (1964)[6] or the Maryland Public Information Act, Md.Code (1984, 2009 Repl.Vol.), State Government Article § 10–618.[7]

---

6. The Freedom of Information Act is entitled "Public information; agency rules, opinions, orders, records, and proceedings" and extensively sets forth the requirements of public agencies to make records available to the public upon request.

7. Section 10–618 states in relevant part:
 (f) (1) Subject to paragraph (2) of this subsection, a custodian may deny inspection of:
 (i) records of investigations conducted by the Attorney General, a State's Attorney, a city or county attorney, a police department, or a sheriff;
 (ii) an investigatory file compiled for any other law enforcement, judicial, correctional, or prosecution purpose; or
 (iii) records that contain intelligence information or security procedures of the Attorney General, a State's Attorney, a city or county attorney, a police department, a State or local correctional facility, or a sheriff.
 (2) A custodian may deny inspection by a person in interest only to the extent that the inspection would:
 (i) interfere with a valid and proper law enforcement proceeding;

Finally, Ofc. Redd's testimony was, at best, cumulative of the testimony given by the other witnesses. The Board heard testimony from numerous witnesses and received into evidence the official statements of multiple officers and bystanders, all of whom essentially adhered to the same chronicle of events.

For all the reasons we have discussed, the BPD did not violate the rights of Det. Ellsworth by failing to disclose information regarding the FBI's investigation of Ofc. Redd nor did the Board err in excluding extrinsic evidence related to Ofc. Redd's prior bad acts. The decision of the circuit court is reversed.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

---

(ii) deprive another person of a right to a fair trial or an impartial adjudication;
(iii) constitute an unwarranted invasion of personal privacy;
(iv) disclose the identity of a confidential source;
(v) disclose an investigative technique or procedure;
(vi) prejudice an investigation; or
(vii) endanger the life or physical safety of an individual.