*Joshua Tripp Ellsworth v. Baltimore Police Department,* No. 58, September Term 2013.

PUBLIC SAFETY – LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS –RIGHT TO DISCLOSURE OF INFORMATION UNDER SECTION 3-104(n) OF THE PUBLIC SAFETY ARTICLE

Section 3-104(n) of the Public Safety Article, Maryland Code (2003, 2011 Repl. Vol.) provides that prior to a hearing under the Law Enforcement Officers' Bill of Rights, an officer under investigation shall be provided with "a copy of the investigatory file and any exculpatory information," but not "nonexculpatory information," upon certain conditions. The Court of Appeals of Maryland concluded the Legislature did not intend to require state and federal agencies to provide information regarding pending investigations unrelated to the officer and his or her specific charges, but rather, to require disclose of information related to the officer and the charges specified.

IN THE COURT OF APPEALS OF

MARYLAND

No. 58

September Term, 2013

---

JOSHUA TRIPP ELLSWORTH

v.

BALTIMORE POLICE
DEPARTMENT

---

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Raker, Irma S. (Retired, specially
assigned),

JJ.

---

Opinion by Battaglia, J.
Barbera, C.J., Harrell and Adkins, JJ.,
dissent.

---

Filed: April 24, 2014

In this case we are called upon to interpret the Law Enforcement Officers' Bill of Rights ("LEOBR"),[1] which is triggered when a "law enforcement officer"[2] is under investigation or subject to interrogation for a reason that may result in "a recommendation of demotion, dismissal, transfer, loss of pay, reassignment, or similar action that is considered punitive".  Section 3-107(a).  Under Section 3-104(n)(ii) of the LEOBR, a law enforcement officer must be provided with "any exculpatory information" upon completion of an investigation, at least ten days before a hearing, upon certain conditions not relevant here.[3]  It is the definition of "exculpatory" with which we

---

[1]  The Law Enforcement Officers' Bill of Rights is located at Section 3-101 *et seq.* of the Public Safety Article, Maryland Code (2003, 2011 Repl. Vol.).  Unless otherwise indicated, all statutory references hereinafter are to the Public Safety Article, Maryland Code (2003, 2011 Repl. Vol.).

[2]  A "law enforcement officer," for the purposes of the LEOBR, includes members of the Police Department of Baltimore City.  Section 3-101(e)(ii)(2).

[3]  Section 3-104(n) provides:

> (n) *Information provided on completion of investigation.*—(1) On completion of an investigation and at least 10 days before a hearing, the law enforcement officer under investigation shall be:
>> (i) notified of the name of each witness and of each charge and specification against the law enforcement officer; and
>> (ii) provided with a copy of the investigatory file and any exculpatory information, if the law enforcement officer and the law enforcement officer's representative agree to:
>>> 1.  execute a confidentiality agreement with the law enforcement agency not to disclose any material contained in the investigatory file and exculpatory

(continued . . .)

are concerned.[4]

In the present case, Joshua Tripp Ellsworth, Petitioner, a homicide detective with the Baltimore City Police Department ("Department"), Respondent, was involved in an incident with Baltimore City Police Sergeant Jonathan Brickus of the Patrol Division. The incident arose during an investigation into a possible abduction, when the victim of the abduction was purportedly being held in a house located on the 2700 block of West Garrison Boulevard.[5] After members of the homicide unit, including Detective Ellsworth, arrived, no agreement was reached as to which unit would supervise the scene,

---

information for any purpose other than to defend the law enforcement officer; and
2. pay a reasonable charge for the cost of reproducing the material.
(2) The law enforcement agency may exclude from the exculpatory information provided to a law enforcement officer under this subsection:
(i) the identity of confidential sources;
(ii) nonexculpatory information; and
(iii) recommendations as to charges, disposition, or punishment.

[4] Detective Ellsworth petitioned for certiorari, which we granted, 432 Md. 466, 69 A.3d 474 (2013), to consider:

Does the statutory requirement for disclosure of "any exculpatory evidence" pursuant to the Law Enforcement Officers' Bill of Rights ("LEOBR"), Md. Public Safety § 3-104(n)(1), require a Police Department to disclose impeachment evidence, specifically information that a prosecution witness employed as a police officer is actually a major narcotics trafficker?

[5] The 2700 block of West Garrison Boulevard is located in the northwest region of Baltimore City. Garrison-Hill Community Association, http://www.neighborhoodlink.com/Garrison-Hill/map (last visited April 17, 2014).

but Sergeant Brickus advised Detective Ellsworth not to enter the home in which the victim and abductor were allegedly ensconced. Detective Ellsworth, however, began walking toward the house and failed to adhere to Sergeant Brickus's orders to stop; Sergeant Brickus told Detective Ellsworth that he was suspended and seized Detective Ellsworth's gun. A more heated argument ensued; Detective Ellsworth, without his gun, advanced on the house and entered the porch. Sergeant Brickus, thereafter, removed Detective Ellsworth from the porch and attempted to handcuff him and then filed a complaint against Detective Ellsworth, which precipitated an investigation by the Internal Investigation Division of the Baltimore Police Department.[6] The investigator found that the allegations against Detective Ellsworth were supported by sufficient evidence,[7] and he was charged with seven violations of four administrative rules:

## CHARGE 1

***

> Rule 1, Conduct: Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any member of the department, either within or without the City of Baltimore, which tends to undermine the good order, efficiency or discipline of the department or which reflects discredit upon the department or any member thereof, or which is prejudicial

---

[6] The Baltimore Police Department rules and regulations regarding investigations and interrogations of law enforcement officers and resulting disciplinary procedures are contained in Baltimore Police Department General Order 48-77, enacted July 1, 1977.

[7] Upon completion of an investigation, an investigator classifies a complaint as either "sustained," "not sustained," "exonerated," or "unfounded," with a sustained charge being one that is "supported by sufficient evidence." *Mayor and City Council of Baltimore v. Maryland Committee Against the Gun Ban*, 329 Md. 78, 85, 617 A.2d 1040, 1043 (1993).

3

to the efficiency and discipline of the department, even though these offenses may not be specifically enumerated or laid down, shall be considered conduct unbecoming a member of the Baltimore Police Department, and subject to disciplinary action by the Police Commissioner.

Specification 1: For that, on or about August 7, 2009, Detective Joshua Ellsworth undermined the good order, efficiency and discipline of the Department by failing to obey several lawful commands and/or orders given to him by Sergeant Jonathan Brickus, a permanent ranking supervisor, not to approach the dwelling located at 2727 W. Garrison Avenue, thereby, conducting himself in a manner unbecoming a member of the Baltimore Police Department.

Specification 2: For that, on or about August 7, 2009, Detective Joshua Ellsworth undermined the good order, efficiency and discipline of the Department by failing to obey a lawful command and/or order from Sergeant Jonathan Brickus, a permanent ranking supervisor, to not knock on the door of the dwelling located at 2727 W. Garrison Avenue, thereby, conducting himself in a manner unbecoming a member of the Baltimore Police Department.

Specification 3: For that, on or about August 7, 2009, Detective Joshua Ellsworth reflected discredit upon himself and the Department, when, while on the scene of a possible domestic abduction, Detective Ellsworth entered into a verbal confrontation with Sergeant Jonathan Brickus, a permanent ranking supervisor, while in plain view of numerous law enforcement members and the general public, thereby, conducting himself in a manner unbecoming a member of the Baltimore Police Department.

## CHARGE 2

\*\*\*

Section 14: No member of the Department shall willfully disobey any lawful command or order, either verbal or written, of any superior or other member designated to command.

4

Specification 1: For that, on or about August 7, 2009, Detective Joshua Ellsworth failed to obey several lawful commands and/or orders from Sergeant Jonathan Brickus, a permanent ranking supervisor, not to approach the dwelling located at 2727 W. Garrison Avenue, a home possibly harboring an alleged abduction victim.

Specification 2: For that, on or about August 7, 2009, Detective Joshua Ellsworth failed to obey a lawful command and/or order from Sergeant Jonathan Brickus, a permanent ranking supervisor, to not knock on the door of the dwelling located at 2727 W. Garrison Avenue.

## CHARGE 3

***

Cooperation with Other Offices and Agencies

Members will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

An officer or agency may be one among many organizations that provide law enforcement services to a jurisdiction. It is imperative that members assist colleagues fully and completely with respect and consideration at all times.

Specification: For that, on or about August 7, 2009, Detective Joshua Ellsworth, a detective within the Homicide Section entered into a verbal confrontation with Sergeant Jonathan Brickus a permanent ranking member of the Northwestern District, while at the scene of a possible domestic abduction at the dwelling of 2727 W. Garrison Avenue, in plain view of numerous law enforcement members and the general public.

## CHARGE 4

***

Section 13: No member of the department at any time shall be insubordinate or disrespectful to a superior.

5

Specification: For that, on or about August 7, 2009, Detective Joshua Ellsworth, a detective within the Homicide Section behaved in an insubordinate and/or disrespectful manner when he entered into a verbal confrontation with Sergeant Jonathan Brickus a permanent ranking member of the Northwestern District, while at the scene of a possible domestic abduction at the dwelling of 2727 W. Garrison Avenue, in plain view of numerous law enforcement members and the general public.

Detective Ellsworth elected a trial board hearing rather than accept the sanction recommended by the Department.[8] Prior to the hearing, counsel for Detective Ellsworth requested in writing from the City Solicitor,[9] representing the Department, "discovery to

---

[8] Section 3-107, in relevant part, provides:

(a) *Right to hearing*.—(1) Except as provided in paragraph (2) of this subsection and § 3-111 of this subtitle, if the investigation or interrogation of a law enforcement officer results in a recommendation of demotion, dismissal, transfer, loss of pay, reassignment, or similar action that is considered punitive, the law enforcement officer is entitled to a hearing on the issues by a hearing board before the law enforcement agency takes that action.

"The function of the hearing board is to make findings of fact and conclusions of law in aid of a recommendation to the Chief". *Boyle v. Maryland-National Capital Park and Planning Comm'n*, 385 Md. 142, 155, 867 A.2d 1050, 1058 (2005).

[9] The Office of Legal Affairs, a branch of the Baltimore City Department of Law, headed by the City Solicitor, reviews internal investigations of law enforcement officers and presents the Department's case before the Hearing Board. *Blondell v. Baltimore City Police Department*, 341 Md. 680, 672 A.2d 639 (1996); Baltimore Police Department; General Order 48-77, Annex H (July 1, 1977). The City Solicitor is the legal representative of the City of Baltimore and the Baltimore Police Department. City of Baltimore, *Law/Practice Groups*, http://www.baltimorecity.gov/Government/Agencies Departments/Law/PracticeGroups.aspx (last visited April 17, 2014). Section 24 of

(continued . . .)

6

the fullest extent allowed by law, and to the fullest extent required by the Maryland Law Enforcement Officers' Bill of Rights, Md. Ann. Code Public Safety § 3-101, *et seq.*" In relevant part, Detective Ellsworth's written request stated:

> Please provide me with a copy of the investigatory file and exculpatory information. Md. Ann. Code Public Safety § 3-104(n) (ii).
>
> ***
>
> Please understand that I interpret the phrase "exculpatory evidence" to mean any evidence favorable to the accused because it tends to prove the accused to be not guilty or tends to mitigate punishment. *Brady v. Maryland*, 373 U.S. 83 (1963).

_____

Article 7 of the Baltimore City Charter (2013) sets forth the responsibilities of the City Solicitor, providing, in relevant part:

> (a) *Legal advisor.*
> The City Solicitor shall be the legal adviser and representative of the City and its several departments, officers, commissions, boards and authorities, and shall have general supervision and direction of the legal business of the City. Except as provided in subsection (c), no such agency or officer or any authority created in connection with municipal affairs shall have authority to employ or retain counsel other than the City Solicitor.
> (b) *Legal proceedings; opinions and advice; deeds, contracts, etc.*
> The City Solicitor shall have sole charge and direction of the preparation and trial of all suits, actions and proceedings of every kind to which the City, or any municipal officer or agency, shall be a party.

At the hearing before a three member board,[10] seven law enforcement witnesses were called to testify by the Department, including Officer Daniel Redd, who had been present during the incident between Detective Ellsworth and Sergeant Brickus.[11]

---

[10] Section 3-107(c) provides, in relevant part:

> (c) *Membership of hearing board.*—(1) Except as provided in paragraph (4) of this subsection and in § 3-111 of this subtitle, the hearing board authorized under this section shall consist of at least three members who:
> (i) are appointed by the chief and chosen from law enforcement officers within that law enforcement agency, or from law enforcement officers of another law enforcement agency with the approval of the chief of the other agency; and
> (ii) have had no part in the investigation or interrogation of the law enforcement officer.
> (2) At least one member of the hearing board shall be of the same rank as the law enforcement officer against whom the complaint is filed.

[11] The hearing board, in its written findings, summarized the testimony of Lieutenant Damien Carter, Police Officer Sharron Mason, Detective Michelle Bolden, Sergeant Jonathan Brickus, Major Terrence McLarney, Detective Joshua Ellsworth, and Officer Daniel Redd. The testimony of Officer Redd's observations regarding the incident between Detective Ellsworth and Sergeant Brickus was encapsulated as follows:

> Officer Redd testified that he was on the scene and observed Det. Ellsworth's arrival. Discussion occurred who would be handling the situation. Sgt. Brickus advised Det. Ellsworth not to approach the house but Det. Ellsworth did. Officer Redd testified that Sgt. Brickus told Det. Ellsworth not to go down the street which he did. Det. Ellsworth returned and headed towards the house again. Sgt. Brickus went up on the porch and advised Det. Ellsworth to turn over his gun and badge. Officer Redd testified that Det. Ellsworth relinquished his badge and gun to Lt. Carter who arrived at the scene. Later, Ellsworth returned to the house and again started knocking on the front door, until he was escorted off the porch.

Counsel for Detective Ellsworth cross-examined Officer Redd regarding whether Officer Redd had "an attorney in [his] employ protecting [his] interests for an ongoing federal criminal investigation" in addition to whether Officer Redd knew he was "the subject, in fact the target, of an ongoing federal criminal investigation." Officer Redd answered both questions in the negative. Counsel for Detective Ellsworth further queried Officer Redd, "Since you were 18 years of age, have you ever distributed a controlled dangerous substance?" Officer Redd again answered "No."

The hearing board found Detective Ellsworth guilty of two of the charges, but not guilty of five. The guilty findings included: Charge I, Specification III for conduct "in a manner unbecoming a member of the Baltimore Police Department" by entering into a verbal confrontation with Sergeant Brickus and Charge IV, Specification I for behaving "in an insubordinate and/or disrespectful manner when he entered into a verbal confrontation" with Sergeant Brickus. The hearing board found Detective Ellsworth not guilty of Charge I, Specification I for conduct "in a manner unbecoming a member of the Baltimore Police Department" by approaching the dwelling at 2727 West Garrison Avenue; not guilty of Charge I, Specification II for conduct "in a manner unbecoming a member of the Baltimore Police Department" by failing to obey Sergeant Brickus to not knock on the door of the dwelling at 2727 West Garrison Avenue; not guilty of Charge II, Specification I for failing "to obey several lawful commands and/or orders" from Sergeant Brickus to not approach the dwelling; not guilty of Charge II, Specification II for failing "to obey a lawful command and/or order" from Sergeant Brickus to not knock on the door of the dwelling; and not guilty of Charge III, Specification I by entering into

9

a verbal confrontation with Sergeant Brickus in plain view of law officers and members of the public. The Hearing Board recommended seven days loss of leave and a letter of reprimand, which the Police Commissioner imposed by Final Order.[12]

Detective Ellsworth filed, in the Circuit Court for Baltimore City, a "Petition for Judicial Review of Decision and Order, and Final Order of Police Commissioner Pursuant to the Maryland Law Enforcement Officers' Bill of Rights."[13] During his hearing in the Circuit Court for Baltimore City, Detective Ellsworth, among other concerns, asserted that his LEOBR hearing was "fundamentally unfair" because of "misconduct on the part of the Department regarding Detective Redd", specifically,

> by failing to disclose . . . exculpatory evidence, the Board was left with the mis-impression that this Detective, Detective Redd, was a credible person. When they should have said; we discredit his testimony, because though he calls himself a detective of the Baltimore City Police Department, he's in fact, one of the largest distributors of heroin in the City of Baltimore.

Detective Ellsworth's counsel further asserted during the circuit court hearing that he inferred that Officer Redd was under investigation because of events occurring before the hearing:

---

[12] The Hearing Board also recommended "that he be transferred from Homicide Section if the Commanding Officer of the Homicide Section wishes to do so", which was not adopted.

[13] Section 3-109(a) provides:

> (a) *By Circuit Court*.—An appeal from a decision made under § 3-108 of this subtitle shall be taken to the circuit court for the county in accordance with Maryland Rule 7-202.

I drew an inference from what had transpired prior to the Hearing Board. The FBI contacted my client about Detective Redd. The DEA contacted me about Detective Redd. Had the ATF contacted me, I would have thought it had something to do with alcohol or guns. Because it was the FBI and the DEA, I suspected that perhaps the man, Detective Redd, had something to do with drugs.

The Department argued that were there to have been an investigation, knowledge of it could not be "imputed to the entire Department"; that at the time of the hearing "there wasn't anything substantiated" against Officer Redd and that "people get investigated all the time" sometimes turning up "nothing"; and, regardless, "even without the testimony of Redd . . . there's enough evidence in the record" that Detective Ellsworth would have been found guilty "[e]ven if we just excluded Redd from the record":

> [W]hat matters is that Ellsworth was involved in this physical or verbal altercation out in public, before everybody. That's the first charge. And the second one is that he was disrespectful. . . .
>
> Those are the two things that he was found guilty of. I don't see how Redd really plays into that at all. I mean, other than, who was in command. But that doesn't really matter. He's not charged with being insubordinate. He's charged with being disrespectful to a superior officer. And, he's charged with conduct that's unbecoming.
>
> I think—Ellsworth's own testimony admits that, you know, he sort of got into this verbal altercation. It was embarrassing to the Police Department. Everybody was watching. Other police officers. . . . There's, you know, sixteen witness's statements of people who, you know, have varying degree of watching this episode. But Redd you can throw out Redd, and there's still plenty of evidence, I think, to find that he was disrespectful to Brickus, and that he acted and his behavior was unbecoming to a police officer.

11

In reversing the Police Commissioner's Final Order imposing the hearing board's recommended sanction, the judge honed in on the fact that the Department failed to disclose any information regarding an investigation of Officer Redd, which, under the court's view, constituted a violation of the LEOBR:

> Petitioner asserts that no exculpatory evidence or material was provided specifically concerning Detective Redd.[14] Petitioner further asserts that at the hearing, Respondent, Baltimore Police Department, continued to deny any knowledge of any exculpatory or impeachment evidence relating to Detective Redd. It is asserted by Petitioner that on or about July 19, 2011, sixty-three days after Petitioner's hearing, Detective Redd was arrested and charged with federal drug conspiracy and firearm charges.
>
> * * *
>
> In the instant case, Petitioner's counsel wrote a detailed letter, which is part of the record therein, to the Office of Legal Affairs of the Baltimore Police Department specifically outlining his requests regarding exculpatory evidence. In response, Petitioner received no evidence whatsoever regarding Detective Redd. On the facts in the record herein, the Court finds that the rights of Petitioner were prejudiced by the manner in which the Respondent dealt with the issues pertaining to Detective Redd. This Court finds that Respondent's failure to disclose any information regarding the investigation of Detective Redd constitutes a violation of Petitioner's rights under the Law Enforcement Officers' Bill of Rights and, therefore, constitutes an unlawful procedure.

The Department appealed to the Court of Special Appeals, presenting the following question for review:

> Did the Circuit Court err in finding that [BPD] violated the rights of the Appellee under LEBOR [sic] § 3-104(n)(1) by

---

[14] The Circuit Court referred to Daniel Redd as "Detective Redd." We use "Officer Redd," consistent with his title and testimony in front of the hearing board.

12

> failing to disclose any information regarding the FBI's investigation of a witness in the trial board, Daniel Redd, for distributing controlled dangerous substances and handgun violations?

*Baltimore Police Department v. Ellsworth*, 211 Md. App. 198, 201, 63 A.3d 1192, 1193 (2013) (alterations in original). The intermediate appellate court, in a reported opinion, reversed the judgment of the Circuit Court, determining, *inter alia*, that the information regarding Officer Redd would not have tended to exonerate Detective Ellsworth of the administrative charges of being disrespectful to a superior officer or engaging in conduct unbecoming an officer, "and, therefore, does not fall within the definition of 'exculpatory.'" *Id.* at 211, 63 A.3d at 1199.

We confront the same issues of whether the precepts of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, should be imported into the LEOBR, and if so, whether the Department is thereby obligated to disclose information in the administrative setting about an alleged criminal investigation of a witness.

In *Brady*, the Supreme Court of the United States held that, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d at 218. In *Brady*, the defendant and a companion, Boblit, were found guilty of murder in the first degree in separate trials and were sentenced to death. *Id.* at 84, 83 S.Ct. at 1195, 10 L.Ed.2d at 217. Prior to trial, Brady requested access to extrajudicial

13

statements that were made by Boblit; although the prosecution disclosed several statements, it withheld the statement in which Boblit admitted to committing the homicide. *Id.* On appeal from his denial of post-conviction relief, we determined that the withholding of the confession was prejudicial to Brady and denied him due process of law and remanded the case for retrial on the issue of punishment only. *Brady v. State*, 226 Md. 422, 430-31, 174 A.2d 167, 171 (1961), *aff'd*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). On certiorari, the Supreme Court affirmed and held that although Boblit's confession did not exculpate Brady, it was material to the determination of his punishment, such that the failure of its disclosure violated due process. *See Brady*, 373 U.S. at 90-91, 83 S.Ct. at 1198, 10 L.Ed.2d at 220.

Subsequently, in *Giglio v. United States*, 405 U.S. 150, 151, 92 S.Ct. 763, 764, 31 L.Ed.2d 104, 106 (1972), the Court confronted the question of whether *Brady* was implicated by the nondisclosure of a promise not to prosecute made by the State to its key witness in exchange for his testimony. The Court determined that because the State relied almost entirely on the witness's testimony as the co-conspirator to substantiate the charges against Giglio for passing forged money orders, his credibility was critical, such that without his testimony "there could have been no indictment and no evidence to carry the case to the jury." *Id.* at 150-51, 154, 92 S.Ct. at 764, 766, 31 L.Ed.2d at 106-07, 109. Therefore, the failure to disclose the plea deal entitled the defendant to a new trial. *Id.* at 155, 92 S.Ct. at 766, 31 L.Ed.2d at 109. In so doing, the Court acknowledged that the State's failure to disclose evidence that could be used for impeachment was not automatically a violation of *Brady*, if the evidence was "not likely to have changed the

14

verdict." *Id.* at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108, quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968).

In *United States v. Agurs*, 427 U.S. 97, 100-03, 96 S.Ct. 2392, 2396-97, 49 L.Ed.2d 342, 347-49 (1976), the Court considered whether the State was required under *Brady* to disclose that the victim in a murder trial had been convicted of assault and two charges of carrying a deadly weapon, which could be used by the defendant to show his propensity for violence in furtherance of Agurs's theory of self-defense. The Court concluded that the victim's convictions were not material to the case because they were cumulative of other evidence and were not likely to have changed the verdict. *Id.* at 113-14, 96 S.Ct. at 2402, 49 L.Ed.2d at 355-56. The Court explained that the prosecutor does not have an obligation to disclose all information, because "[i]f everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice." *Id.* at 109, 96 S.Ct. at 2400, 49 L.Ed.2d at 353.

Subsequently, in *United States v. Bagley*, 473 U.S. 667, 670-74, 105 S.Ct. 3377-79, 87 L.Ed.2d 481, 486-89 (1985), the Court addressed whether the State's duty to disclose under *Brady* extended to the terms of the agreements reached between two key witnesses with the Bureau of Alcohol, Tobacco and Firearms to supply information about the defendant's narcotics and gun dealings in exchange for money. The conviction was reversed and remanded because the prosecutor had misrepresented the lack of inducement and there could be a "reasonable probability" that, had the information been

15

disclosed, the result of the trial would have been different. *Id.* at 683-84, 105 S.Ct. at 3384-85, 87 L.Ed.2d at 495.

Our *Brady* jurisprudence began in 1964 with *Dyson v. Warden of the Maryland Penitentiary*, 233 Md. 630, 196 A.2d 455 (1964), and extends to our most recent case of *Derr v. State*, 434 Md. 88, 73 A.3d 254 (2013). This jurisprudence clearly shows that *Brady* is limited to the criminal context and has never been applied in a civil or administrative setting. The Supreme Court, likewise, has not extended *Brady* beyond the criminal context and has explained that *Brady* and its progeny are "access-to-evidence cases", specific to criminal prosecutions, imposed to ensure "the integrity of our criminal justice system." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 420 (1984).

We have found violations of *Brady* in situations in which the State has failed to disclose confessions by one other than the defendant, *Bloodsworth v. State*, 307 Md. 164, 175, 512 A.2d 1056, 1061 (1986), prior material inconsistencies in statements made by key witnesses and in situations in which a witness for the State had received inducements to testify, which had not been disclosed by the prosecution. *Ware v. State*, 348 Md. 19, 50, 702 A.2d 699, 714 (1997); *Wilson v. State*, 363 Md. 333, 356, 768 A.2d 675, 687 (2001); *Conyers v. State*, 367 Md. 571, 606-07, 790 A.2d 15, 36 (2002); *State v. Williams*, 392 Md. 194, 228, 896 A.2d 973, 993 (2006); *Harris v. State*, 407 Md. 503, 524-26, 966 A.2d 925, 937-38 (2009).

We have not found *Brady* violations where the undisclosed evidence was not material to the conviction, *State v. Tichnell*, 306 Md. 428, 463, 509 A.2d 1179, 1197

16

(1986); would have impeached cumulative or non-material witnesses' testimony, *Grandison v. State*, 390 Md. 412, 434-35, 889 A.2d 366, 379 (2005); or was cumulative of other evidence demonstrating the victim's propensity for violence. *State v. Thomas*, 325 Md. 160, 192, 599 A.2d 1171, 1186 (1992).[15]

We, in fact, have declined to apply the discovery requirements of *Brady* in a civil context. In *Wagonheim v. Maryland State Board of Censors*, 255 Md. 297, 300, 308-09, 258 A.2d 240, 241, 245 (1969), *aff'd sub nom. Grove Press, Inc. v. Maryland State Board of Censors*, 401 U.S. 480, 91 S.Ct. 966, 28 L.Ed.2d 205 (1971), an appeal from a ruling in which a movie was disapproved for licensing as being obscene, the petitioner alleged that the lower court erred by refusing "to order the Attorney General's office to disclose the names of all the experts whom they requested to view the film", which he analogized to the State's disclosure requirement under *Brady*. We declined to apply the *Brady* tenets and opined that even were we to apply them, the Attorney General was not required to provide the information requested. *Id.* at 309, 258 A.2d at 246

We have, since *Brady*, codified the State's disclosure requirement in Maryland Rule 4-263,[16] a rule of criminal procedure which, in 1986, provided for disclosure of

---

[15] In *Williams v. State*, 416 Md. 670, 691-95, 7 A.3d 1038, 1050-52 (2010), we declined to determine whether failure to disclose a prior statement made by an eyewitness, that she was legally blind, was a material omission in violation of *Brady*, and remanded on other grounds.

[16] Maryland Rule 4-263, "Discovery in Circuit Court," provides, in pertinent part:

(d) **Disclosure by the State's Attorney.**
* * *

(continued . . .)

17

(5) Exculpatory information. All material or information in any form, whether or not admissible, that tends to exculpate the defendant or negate or mitigate the defendant's guilt or punishment as to the offense charged;

(6) Impeachment information. All material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:

(A) evidence of prior conduct to show the character of the witness for untruthfulness pursuant to Rule 5-608 (b);

(B) a relationship between the State's Attorney and the witness, including the nature and circumstances of any agreement, understanding, or representation that may constitute an inducement for the cooperation or testimony of the witness;

(C) prior criminal convictions, pending charges, or probationary status that may be used to impeach the witness, but the State's Attorney is not required to investigate the criminal record of the witness unless the State's Attorney knows or has reason to believe that the witness has a criminal record;

(D) an oral statement of the witness, not otherwise memorialized, that is materially inconsistent with another statement made by the witness or with a statement made by another witness;

(E) a medical or psychiatric condition or addiction of the witness that may impair the witness's ability to testify truthfully or accurately, but the State's Attorney is not required to inquire into a witness's medical, psychiatric, or addiction history or status unless the State's Attorney has information that reasonably would lead to a belief that an inquiry would result in discovering a condition that may impair the witness's ability to testify truthfully or accurately;

(F) the fact that the witness has taken but did not pass a polygraph examination; and

(G) the failure of the witness to identify the defendant or a co-defendant;

The District Court requirements are set forth in Maryland Rule 4-262, which provides, in relevant part:

**(c) Obligations of the parties.**

(continued . . .)

"[a]ny material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged."[17] In 2008, we conformed Rule 4-263 to our jurisprudence to better define the scope of discovery. Supplement to the One Hundred Fifty-Eighth Report of the Standing Committee on Rules of Practice and Procedure at 4 (March 25, 2008). At that time, Rule 4-263 was amended to more specifically require disclosure by the State of evidence of a relationship or agreement between the witness and prosecution; prior criminal convictions; materially inconsistent witness statements not otherwise memorialized; medical, psychiatric, or addiction conditions of the witness

_____

(1) *Due diligence.* The State's Attorney and defense shall exercise due diligence to identify all of the material and information that must be disclosed under this Rule.

(2) *Scope of obligations.* The obligations of the State's Attorney and the defense extend to material and information that must be disclosed under this Rule and that are in the possession or control of the attorney, members of the attorney's staff, or any other person who either reports regularly to the attorney's office or has reported to the attorney's office in regard to the particular case.

**Cross references.** For the obligations of the State's Attorney, see *State v. Williams*, 392 Md. 194 (2006).

**(d) Disclosure by the State's Attorney.**

(1) *Without request.* Without the necessity of a request, the State's Attorney shall provide to the defense all material or information in any form, whether or not admissible, that tends to exculpate the defendant or negate or mitigate the defendant's guilt or punishment as to the offense charged and all material or information in any form, whether or not admissible, that tends to impeach a State's witness.

[17] Rule 4-263 was derived from Maryland Rule 741, which mandated disclosure of "[a]ny material or information within his possession or control which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce his punishment therefor". Rule 741 (1984).

19

that would impair his ability to testify truthfully; the witness's failure of a polygraph examination; the witness's failure to identify the defendant; and "evidence of prior conduct to show the character of the witness for untruthfulness pursuant to Rule 5-608 (b)."[18] *Id.* at 4-5.

What is significant is that our Rule does not require disclosure by the State of alleged investigations or "bad acts" of witnesses, not having resulted in a conviction and not related to a witness's character for untruthfulness. In this regard, we have long-held that "mere accusations of crime or misconduct may not be used to impeach. . . . [A]ccusations of misconduct are still clothed with the presumption of innocence and receiving mere accusations for this purpose would be tantamount to accepting someone else's assertion of the witness' guilt and pure hearsay." *State v. Cox*, 298 Md. 173, 179-80, 468 A.2d 319, 322 (1983) (citations omitted). Furthermore, not all acts of misconduct are "prior bad acts that are relevant to assessing [the witness's] credibility regardless of whether a conviction resulted", but only those crimes or bad acts that

---

[18] Maryland Rule 5-608(b), "Evidence of character of witness for truthfulness or untruthfulness" provides, in relevant part:

> (b) **Impeachment by examination regarding witness's own prior conduct not resulting in convictions.** The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

logically relate to a witness's character for untruthfulness. *Robinson v. State*, 298 Md. 193, 197, 468 A.2d 328, 331 (1983); *see Ricketts v. State*, 291 Md. 701, 704, 436 A.2d 906, 907-08 (1981).

Detective Ellsworth, as he must, concedes that the constitutional protections afforded by *Brady* do not apply in an administrative setting, but, instead, argues that "exculpatory" is "a term of art whose meaning may be found in *Brady* and its progeny," which the Legislature intended to import into the statute by including the term "exculpatory" in the 1987 amendment to Section 3-104(n). He argues that he was prejudiced by the Department's failure to disclose the alleged investigation of Officer Redd, because he could not have been found guilty of insubordination, unless the "Hearing Board weighed the testimony of Detective Redd against that of three others: Lieutenant Carter, Major McLarney and Detective Joshua Ellsworth."

The Department argues that the language of Section 3-104(n) is not ambiguous and the plain meaning of the terms should apply: "exculpatory" meaning "tending to clear from a charge of fault or of guilt" and "impeach" meaning "to challenge or discredit the credibility, of a witness," citing Webster's Revised Unabridged Dictionary 521, 734 (1913). Further, the Department argues that the legislative history of the LEOBR does not indicate that the Legislature intended "exculpatory" in Section 3-104(n) to include all impeachment information, as the statute differentiated between that which is "exculpatory information" and that which is "nonexculpatory information." Further, the Department proffers that Rule 4-263 provides guidance as to the distinct definitions of the terms "exculpatory" and "impeachment," such that the information sought by

21

Detective Ellsworth was "nonexculpatory", because it did not tend to negate the guilt of Detective Ellsworth. The Department argues, alternatively, even assuming *arguendo*, it was required to disclose information regarding an investigation by the federal law enforcement agencies into Officer Redd's activities, that failure did not prejudice Detective Ellsworth as he was aware of the very information he alleges he was wrongfully denied; because mere accusations of illegal conduct cannot be used to impeach a witness; extrinsic evidence could not have been introduced to contradict Officer Redd's testimony; and also Officer Redd's testimony was cumulative of other witnesses' testimony.

What is clear, however, is that the legislative history of Section 3-104(n) contains no reference to *Brady* and its progeny. It does, however, reflect a myriad of concerns regarding disclosure of information beyond the officer and the conduct with which the officer was charged.

The LEOBR was enacted in Chapter 722 of the Maryland Laws of 1974, "to provide procedural safeguards for law enforcement officers during any investigation and subsequent hearing that might result in disciplinary action . . . 'in *departmental* disciplinary matters.'" *Boyle v. Maryland-National Capital Park & Planning Comm'n*, 385 Md. 142, 155, 867 A.2d 1050, 1058 (2005) (emphasis in original), quoting *Moats v. City of Hagerstown*, 324 Md. 519, 526, 597 A.2d 972, 975 (1991). The investigation of charges against a law enforcement officer and a resultant hearing under the LEOBR are distinctly administrative. *See Popkin v. Gindlesperger*, 426 Md. 1, 4-5, 43 A.3d 347, 349-50 (2012); *Montgomery County Maryland v. Shropshire*, 420 Md. 362, 374-75, 23

22

A.3d 205, 212-13 (2011); *Coleman v. Anne Arundel County Police Department*, 369 Md. 108, 122, 797 A.2d 770, 779 (2002) (stating that the LEOBR is a law enforcement officer's "exclusive remedy in matters of departmental discipline").

Section 3-104(n) of the LEOBR sets forth the requirements for pre-hearing disclosure to an officer under investigation:

> (n) *Information provided on completion of investigation.—*
> (1) On completion of an investigation and at least 10 days before a hearing, the law enforcement officer under investigation shall be:
>> (i) notified of the name of each witness and of each charge and specification against the law enforcement officer; and
>> (ii) provided with a copy of **the investigatory file**[19] **and any exculpatory information**, if the law enforcement officer and the law enforcement officer's representative agree to:
>>> 1. execute a confidentiality agreement with the law enforcement agency not to disclose any material contained in the investigatory file and exculpatory information for any purpose other than to defend the law enforcement officer; and
>>> 2. pay a reasonable charge for the cost of reproducing the material.
> (2) **The law enforcement agency may exclude** from the exculpatory information provided to a law enforcement officer under this subsection:
>> (i) the identity of confidential sources;
>> (ii) **nonexculpatory information**; and

---

[19]   An internal investigation file in the Baltimore City Police Department contains the complaint statement, a summary and conclusion of the investigation written by the investigator, statements of the accused officer and all witnesses including police personnel and civilians, names of all investigating personnel, and all other reports, photographs, or documents collected in the course of the investigation.  Baltimore Police Department General Order 48-77, Appendix 1 to Annex A at A-1-1 to A-1-3, effective July 1, 1977, amended July 1, 1983.

(iii) recommendations as to charges, disposition, or punishment.

Section 3-104(n) (emphasis added). The LEOBR though, does not define "exculpatory information" or "nonexculpatory information", nor do other provisions of the Maryland Code in which the term "exculpatory" is used.[20]

The precursor of Section 3-104(n) was Section 728(b)(5) of Article 27, Maryland Code (1957, 1971 Repl. Vol., 1974 Supp.), which provided an officer under investigation with information regarding the "nature of the investigation" and "the names of all witnesses." The ambiguity of these provisions led to various proposals for revision by the General Assembly in 1976 and 1977. *See* Letter from Roy W. Rafter, Chairman, Governor's Commission to Review the Law Enforcement Officers Bill of Rights to Hon. Steny Hoyer, President of the Senate, and Hon. John Hanson Briscoe, Speaker of the House (January 7, 1977).

By 1984, House Bill 916[21] was proposed to provide a police officer under investigation with a copy of the investigatory file in addition to the names of any

---

[20] "Exculpatory" also appears in Section 8-201(a)(5)(iii) of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl. Vol.) ("DNA Evidence—Postconviction Review") and Section 10-905 of the Correctional Services Article (1999, 2008 Repl. Vol.) ("State Correctional Officers' Bill of Rights"), which was adapted from the Law Enforcement Officers' Bill of Rights. *See* Senate Judicial Proceedings Committee Floor Report, Senate Bill 887 (2010).

[21] House Bill 916 was cross-filed as Senate Bill 954. Both bills were adopted and House Bill 916, which contained modified language to exclude from disclosure of "any information which will not be used in the upcoming hearing," was signed into law by Governor Harry Hughes.

witnesses and all charges and specifications.[22]   While House Bill 916 was under

consideration in the House Judiciary Committee, Bernard D. Crooke, Chief of Police for

the Montgomery County Department of Police, voiced strong opposition to the bill as

worded because it would have required disclosure of information beyond the officer's

involvement in the specific incident, thereby potentially compromising witnesses'

cooperation and more importantly, "other law enforcement investigations":

---

[22] House Bill 916 as initially introduced in the House Judiciary Committee provided:

> FOR the purpose of providing that a law enforcement officer under investigation shall be furnished with a copy of the investigatory file not less than a certain time before any hearing if certain conditions as to confidentiality of the file and payment of costs are met.
>
> * * *
>
> (5) The law-enforcement officer under investigation shall be informed in writing of the nature of the investigation prior to any interrogation.  Upon completion of the investigation, the law-enforcement officer shall be notified of the name of any witness and all charges and specifications against the officer not less than ten days prior to any hearing. IN ADDITION, THE LAW ENFORCEMENT OFFICER UNDER INVESTIGATION SHALL BE FURNISHED WITH A COPY OF THE INVESTIGATORY FILE NOT LESS THAN 10 DAYS BEFORE ANY HEARING IF THE OFFICER AND THE OFFICER'S REPRESENTATIVE AGREE:
>
> (I) TO EXECUTE A CONFIDENTIALITY AGREEMENT WITH THE LAW ENFORCEMENT AGENCY TO NOT DISCLOSE ANY OF THE MATERIAL CONTAINED IN THE RECORD FOR ANY PURPOSE OTHER THAN TO DEFEND THE OFFICER; AND
> (II) TO PAY ANY REASONABLE CHARGE FOR THE COST OF REPRODUCING THE MATERIAL INVOLVED.

It cannot be stated too strongly the "chilling effect" a wholesale release of the entire file would have on investigations into alleged police misconduct. Citizen witnesses and fellow police officers are frequently reluctant to speak out in these situations as it is, but we are presently able to assure them that their statement will be released only if they are called upon to testify at the trial board and then, only that portion of their comments which is relevant to this charge will be released.

* * *

Another consideration is that release of the entire file could jeopardize other law enforcement investigations. Internal affairs officers frequently encounter a situation where information on a distinct charge against the same or different officers is contained in one statement. Sometimes this information is part of charges that have been completed and sometimes the investigation is still ongoing. Under the proposed amendment, this information would be released as well and would very likely compromise the progress of those ongoing investigations.

Opposition Statement to House Bill 916 (March 8, 1984) (statement of Bernard Crooke, Chief of Police for the Montgomery County Department of Police). Significantly, the final version of the bill excluded disclosure of information within the investigatory file that was not relevant to the charges for which the officer was under investigation, with the provision that: "the law enforcement officer under investigation shall be furnished with a copy of the investigatory file, **excluding** the identity of confidential sources, **any information which will not be used in the upcoming hearing**, and recommendations as to charges, disposition or punishment".[23] 1984 Maryland Laws, Chapter 660, codified at

---

[23] House Bill 916, as adopted, provided, in relevant part:

The law-enforcement officer under investigation shall be informed in writing of the nature of the investigation prior to

(continued . . .)

26

Section 728(b)(5) of the Maryland Code (1957, 1981 Repl. Vol., 1984 Supp.) (emphasis

added).[24]

any interrogation. Upon completion of the investigation, the law-enforcement officer shall be notified of the name of any witness and all charges and specifications against the officer not less than ten days prior to any hearing. IN ADDITION, THE LAW ENFORCEMENT OFFICER UNDER INVESTIGATION SHALL BE FURNISHED WITH A COPY OF THE INVESTIGATORY FILE, EXCLUDING THE IDENTITY OF CONFIDENTIAL SOURCES, ANY INFORMATION WHICH WILL NOT BE USED IN THE UPCOMING HEARING, AND RECOMMENDATIONS AS TO CHARGES, DISPOSITION OR PUNISHMENT, NOT LESS THAN 10 DAYS BEFORE ANY HEARING IF THE OFFICER AND THE OFFICER'S REPRESENTATIVE AGREE:

(I) TO EXECUTE A CONFIDENTIALITY AGREEMENT WITH THE LAW ENFORCEMENT AGENCY TO NOT DISCLOSE ANY OF THE MATERIAL CONTAINED IN THE RECORD FOR ANY PURPOSE OTHER THAN TO DEFEND THE OFFICER; AND

(II) TO PAY ANY REASONABLE CHARGE FOR THE COST OF REPRODUCING THE MATERIAL INVOLVED.

1984 Md. Laws, Chap. 660, codified at Md. Code (1957, 1981 Repl. Vol., 1984 Supp.), Art. 27, § 728(b)(5).

[24] In 1985 and 1986 the House Judiciary Committee and Senate Judicial Proceedings Committee considered additional modifications to the exclusionary language of Section 728(b)(5) to further restrict access. *See* House Bill 644 and Senate Bill 331 (1985) (proposing to exclude any "information that is the subject of a valid and separate internal investigation"); Senate Bill 443 (1986) (proposing to exclude "any information that is the subject of a valid internal investigation that is unrelated to the charges and specifications against the officer"); House Bill 1735 (1986) (proposing to exclude "any information that is the subject of any other pending internal investigation unrelated to the charges and specifications against the officer").

In 1987, the Legislature adopted House Bill 704, which set forth the current disclosure requirements of Section 3-104(n).[25] Initially, House Bill 704[26] provided that the officer under investigation should be given a copy of the investigatory file excluding any information that was "the subject of any other pending internal investigation" if that information was "irrelevant" to the charges for which the officer was investigated.[27] The

[25] The LEOBR was adopted without substantive change and recodified as Section 3-101 *et seq.*, of the Public Safety Article, Maryland Code (2003), when the General Assembly added the "Public Safety Article", recodifying certain statutes previously contained in Articles 41 "Executive and Administrative Departments"), 88B ("Department of State Police"), and 27 ("Crimes and Punishment"), among others, relating to State fire prevention, policies of the Department of State Police and emergency maintenance systems. 2003 Md. Laws, Chap. 5. Section 728(b) of Article 27 was recodified and adopted without substantive change in 2003, as Section 3-104(n) of the Public Safety Article, Maryland Code (2003).

[26] The Legislature also simultaneously considered, but rejected, Senate Bill 600, which excluded from disclosure "any information that is the subject of any other pending internal investigation which is irrelevant to the charges and specifications against the officer" in the investigatory file.

[27] House Bill 704 as originally introduced in the House Judiciary Committee provided:

> (5) The law-enforcement officer under investigation shall be informed in writing of the nature of the investigation prior to any interrogation. Upon completion of the investigation, the law-enforcement officer shall be notified of the name of any witness and all charges and specifications against the officer not less than ten days prior to any hearing. In addition, the law-enforcement officer under investigation shall be furnished with a copy of the investigatory file, excluding the identity of confidential sources, any information . . . THAT IS THE SUBJECT OF ANY OTHER PENDING INTERNAL INVESTIGATION WHICH IS IRRELEVANT TO THE CHARGES AND SPECIFICATIONS AGAINST THE OFFICER, and recommendations as to charges, disposition,

(continued . . .)

28

Fraternal Order of Police Lodge Numbers 30 and 69 supported the bill in its original form, while the Maryland Department of Public Safety and Correctional Services opposed the bill as drafted because it would "put this Agency in a position of revealing information that may be to the detriment of the officer involved, or other officers that may be involved or other citizens that might be involved." Maryland Department of Public Safety and Correctional Services, Position on Proposed Legislation House Bill 704 (February 13, 1987) (statement of Sergeant Don Hoffman of the Maryland State Police). Lieutenant Emmit Jones of the Baltimore Police Department also provided written testimony against the bill, cautioning against disclosure of information related to pending investigations that could be compromised:

> It would provide to the accused officer facing a Hearing (Trial Board) not only the investigative file involving the pending hearing, but any other pending Internal Investigation File which is relevant to the charges and specifications against the officer. . . .
>
> It is conceivable that an officer could be facing a Hearing for Excessive Force while he is being investigated for possible criminal activity which is relevant to the charge of Excessive Force. To be faced with a legal requirement to divulge the second investigation prior to completion of the Hearing is not only unjustified but would compromise the ongoing investigation.

---

or punishment, not less than 10 days before any hearing if the officer and the officer's representative agree:
(i) To execute a confidentiality agreement with the law-enforcement agency to not disclose any of the material contained in the record for any purpose other than to defend the officer; and
(ii) To pay any reasonable charge for the cost of reproducing the material involved.

Statement of Lieutenant Emmit Jones of the Baltimore Police Department Regarding House Bill 704 – Law Enforcement Officers' Bill of Rights – Investigatory Files – As Prepared for a Hearing Before the House Judiciary Committee (March 16, 1987).

The House Judiciary Committee recommended language that specified that the Department must provide the officer under investigation with the investigatory file and information that was "exculpatory" but not information that was "nonexculpatory" to the charges for which the officer was under investigation. House Bill 704 as adopted, provided:

> (III) IN ADDITION, THE LAW-ENFORCEMENT OFFICER UNDER INVESTIGATION SHALL BE FURNISHED WITH A COPY OF THE INVESTIGATORY FILE AND ANY EXCULPATORY INFORMATION, BUT EXCLUDING:
> 1. THE IDENTITY OF CONFIDENTIAL SOURCES;
> 2. ANY NONEXCULPATORY INFORMATION; AND
> 3. RECOMMENDATIONS AS TO CHARGES, DISPOSITION, OR PUNISHMENT.
>
> (IV) THE LAW-ENFORCEMENT OFFICER UNDER INVESTIGATION SHALL BE FURNISHED WITH A COPY OF THE INVESTIGATORY FILE AND THE EXCULPATORY INFORMATION DESCRIBED UNDER SUBPARAGRAPH (III) OF THIS PARAGRAPH NOT LESS THAN 10 DAYS BEFORE ANY HEARING IF THE OFFICER AND THE OFFICER'S REPRESENTATIVE AGREE:
> 1. to execute a confidentiality agreement with the law-enforcement agency to not disclose any of the material contained in the record for any purpose other than to defend the officer; and
> 2. to pay any reasonable charge for the cost of reproducing the material involved.

30

Maryland Laws 1987, Chapter 499. What is significant, then, is the fact that if exculpatory information were disclosed, it would relate only to the officer investigated and the specific incident in which the officer had been involved.

Not only is there absolutely nothing in the text of Section 3-104(n) or its legislative history to indicate, as Detective Ellsworth suggests, that the General Assembly considered or intended to use the term "exculpatory" to import *Brady* and its progeny into the administrative LEOBR process, but there is nothing to indicate that the Legislature intended to require state and federal agencies to provide information regarding pending investigations unrelated to the officer and his or her specific charges. Rather, the history supports only the conclusion that the Legislature only intended to disclose information related to the officer and the charges specified rather than the disclosure of information regarding an alleged extraneous investigation of a witness, which did not relate to the officer and his or her specific charges involved in the hearing. As a result, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Baltimore City
Case No. 24-C-11-005397
Argued: February 10, 2014

IN THE COURT OF APPEALS OF
MARYLAND

No. 58

September Term, 2013

JOSHUA TRIPP ELLSWORTH

v.

BALTIMORE POLICE DEPARTMENT

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Raker, Irma S. (Retired,
          Specially Assigned),

JJ.

Dissenting Opinion by Harrell, J.,
which Barbera, C.J., and Adkins, J., join.

Filed: April 24, 2014

I dissent. Although I agree with the Majority opinion's conclusion that there is no indication in the legislative history of H.B. 704 of 1987 that suggests explicitly that the Legislature intended to import broadly *Brady* and its progeny into the LEOBR by inclusion of a requirement that a charged officer be given pre-hearing by the department any exculpatory information (Maj. slip op. at 31), I disagree with the Majority opinion's absence of any appreciation that "exculpatory information" should include potential impeachment information regarding a departmental material witness to the alleged misconduct. The Majority opinion concludes that "the Legislature only intended to disclose information related to the officer and the charges specified rather than the disclosure of information regarding an alleged extraneous investigation of a witness, which did not relate to the officer and his or her specific charges involved in the hearing." *Id.* Neither the language of H.B. 704, as enacted, nor the legislative history pointed to by the Majority opinion (Maj. slip op. at 28-29), supports the Majority's conclusion. Moreover, to countenance the police department offering as one of its material witnesses an officer that, at the time he was called to testify, was suspected by the department of being a distributor of illegal narcotics, and yet suppress that information, is wrong manifestly (even in an administrative proceeding).

Lieutenant Jones's testimony before the Legislature on H.B. 704 (recounted in pertinent part by the Majority slip opinion at 29) used as an illustration of what concerned him about the original bill the example of an ongoing, parallel investigation of the <u>charged officer</u> that could be compromised by premature revelation. This does not

bolster the Majority opinion's view that the Legislature was concerned with divulging impeachment evidence of a departmental witness.

The legislative testimony of Sergeant Hoffman (Maj. slip op. at 29) was directed likewise to the unamended version of H.B. 704. The original bill excluded from disclosure "any information that is the subject of any other pending investigation which is irrelevant to the charges and specifications against the officer." Maj. slip op. at 28 n.26. Even then, Sergeant Hoffman's relevant concern about the original language was about "revealing information that may be to the detriment of . . . other officers that may be involved . . . ." Maj. slip op. at 29. That also is not the circumstance of the present case.

Thus, the change made in the proposed legislation, after hearing these testimonies, should be read in the light of the concerns expressed to the Legislature, none of which suggested that impeachment information regarding a departmental material witness in the trial board proceedings of the pertinent charges against Detective Ellsworth should be deemed excluded as "non-exculpatory information."

I find it reprehensible that a police department may blind a trial board to the obvious credibility suspicions that would have arisen surely from the department producing a material witness (another police officer) that it has reason to suspect may be a drug dealer. Had Detective Redd been so discredited, the case against Detective Ellsworth could have come down essentially to a "he said/he said" contest between Detective Ellsworth and Sergeant Brickus. With the unsullied "eyewitness" corroboration by Detective Redd of Sergeant Brickus's version of what happened on 7 August 2009 at 2727 W. Garrison Avenue in Baltimore, the scales of the weight of the

evidence tipped in the department's favor. The proceedings, in my judgment, were flawed fatally.

I would hold that § 3-104(n)(1)(ii) of the Public Safety Article of the Maryland Code means that "exculpatory information" required to be disclosed includes potential impeachment information, known to the department, regarding a witness the department intends to call at the trial board proceedings. As that was not done in the present case and the implicated witness was a material eyewitness, Detective Ellsworth is entitled to a new trial board hearing. Accordingly, I would reverse the judgment of the Court of Special Appeals and remand the matter to that Court with directions to affirm the judgment of the Circuit Court for Baltimore City.

Chief Judge Barbera and Judge Adkins authorize me to state that they join in the views expressed in this opinion.